Argued and submitted June 13, reversed and remanded in part and vacated in part December 31, 1996, both petitions for review denied May 27, 1997 (325 Or 368)

# FARMERS INSURANCE COMPANY OF OREGON,
an Oregon corporation,
*Appellant,*

*v.*

# John L. MUNSON,
Margie A. Goddard,
as personal representative for the Estate of
Marc E. Goddard, deceased,
and State Farm Mutual Automobile
Insurance Company,
*Respondents,*

*and*

# Helen FOLEY,
*Defendant.*

(88C-11994; CA A90199)

930 P2d 878

William L. Hallmark argued the cause for appellant. With him on the opening brief was Hallmark, Keating & Abbott, P.C. With him on the reply brief were Brian M. McQuaid and Hallmark, Keating & Abbott, P.C.

Margaret H. Leek Leiberan argued the cause for respondents Munson and Goddard. With her on the brief were Leiberan & Gazeley, Carl Amala, J. P. Harris II, J. P. Harris II, P.C., and Ira S. Feitelson.

Ralph C. Spooner argued the cause for respondent State Farm Mutual Automobile Insurance Co. With him on the brief was Mary Kim Wood.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

Deits, P. J., concurring.

## HASELTON, J.

Plaintiff, Farmers Insurance Company of Oregon, appeals from a judgment, entered after a jury trial, declaring that policies it issued separately to defendant John Munson and to defendant Helen Foley,[1] covered a fatal automobile accident. In that accident, Munson, who was driving a pickup owned by Foley, struck another vehicle, killing the driver.[2] We reverse and remand.

This is the second time this insurance coverage dispute has been before us. *See Farmers Ins. Co. v. Munson*, 127 Or App 413, 873 P2d 370, *rev den* 320 Or 109 (1994) (*"Munson I"*). Some recapitulation is necessary to put the parties' present arguments into perspective.

Foley managed a tree farm that her son owned near Salem. In the early 1980's, Munson, a friend of both Foley and her son, began working from time to time on the farm, planting and caring for the trees. In the summer of 1985, Foley bought a pickup to use on the farm. From that time until early 1987, Munson rarely drove Foley's pickup. However, in 1987, Munson worked more frequently at the farm and began driving the pickup more frequently. On October 29, 1987, Foley asked Munson to take the squash from her garden and deliver it to his friends, using her pickup. Munson delivered the squash to his friends at various taverns, drinking a sufficient quantity of alcohol to be legally intoxicated. As Munson was pulling into a tavern near Salem to make his last delivery, he struck another vehicle, killing the driver, Marc Goddard.

In December 1987, defendant Margie Goddard, as personal representative of her son's estate, brought a wrongful death action against Munson. In October 1988, Goddard amended that action to name Foley as an additional defendant under a "negligent entrustment" claim. The jury in the

---

[1] Although Foley was joined as a defendant in this case, she is not one of the respondents on appeal.

[2] Defendant Margie Goddard is the mother of the driver who was killed in the accident. Defendant State Farm Mutual Automobile Insurance Company is Goddard's insurer.

wrongful death case ultimately awarded Goddard compensatory and punitive damages against Munson but rejected her claim against Foley. On Munson's appeal, we affirmed. *Goddard v. Munson*, 108 Or App 342, 816 P2d 619, *rev den* 312 Or 525 (1991).

At the time of the accident, both Munson and Foley carried automobile insurance with plaintiff. In December 1988, and after the wrongful death action was filed, plaintiff brought this action, seeking a declaration that plaintiff was not obligated, under either Munson's or Foley's policy, "to pay any sums Munson may owe as a result of the accident."

In requesting that relief, plaintiff invoked two coverage exclusions. First, Munson's policy contained the following exclusion:

"The coverage does not apply to:

"10. **Bodily Injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle other than **your insured car**, which is owned by or furnished or available for regular use by you[.]"

Plaintiff alleged that, because Foley's pickup was "available [to Munson] for regular use," Munson's policy did not cover his accident.

Second, Foley's policy excluded coverage for:

"[a]ny person who uses a vehicle without having sufficient reason to believe that the use is with permission of the owner."

Plaintiff alleged that, on the day of the accident, Munson was driving Foley's pickup with Foley's permission; that Foley had conditioned that permission on Munson not driving while intoxicated; and that, because Munson was intoxicated at the time of the collision, his use at that time was not permissive.[3]

In the "first round" of this litigation, which culminated in our opinion in *Munson I*, the coverage dispute was tried to the court, notwithstanding all parties' objections that

---

[3] As described below, there was conflicting evidence during the declaratory judgment trial as to the exact nature of Foley's "rule." *See* 145 Or App at 526-27.

disputed factual issues necessitated a jury trial. The trial court concluded that: (1) there was coverage under Foley's policy, because Munson's use was permissive; but (2) there was no coverage under Munson's policy, because the pickup was "available for [his] regular use." Plaintiff appealed the trial court's determination on the Foley policy, and defendants cross-appealed the determination on the Munson policy. All parties assigned error to the trial court's denial of their requests for a jury trial.

We concluded, *inter alia*, that both plaintiffs and defendants were entitled to a jury trial on disputed factual issues related to the application of the Munson and Foley policies. 127 Or App at 419. In particular, we stated:

> "The first issue decided by the trial court was whether Munson was an 'insured person' under the policy issued to Foley by plaintiff. Whether Munson is an insured person under Foley's policy depends on whether Munson had 'sufficient reason to believe' he was operating the pick-up with Foley's permission. This requires a factual inquiry into, *inter alia*, the scope of Munson's permission on the day of the accident, what Foley told Munson about drinking and driving, and whether Foley enforced any policy that she had about Munson's drinking and driving.

> "The trial court also decided that Munson had no coverage under his own policy because the pick-up was available for his regular use. Whether the pick-up was available for Munson's 'regular use' requires a factual inquiry into, *inter alia*, how often the pick-up was available and whether Munson and Foley had an understanding, express or implied, that Munson could use the pick-up whenever he desired." *Id.*

We concluded that "[t]here are additional factual questions remaining that the parties are entitled to have decided by a jury," *id.* at 420, and, consequently, reversed and remanded for a new trial.

The proceedings and result on remand are the subject of this appeal. On remand, the parties vigorously contested the respective roles of court and jury with respect to coverage issues. Of particular significance, plaintiff asserted that both of the pertinent provisions were unambiguous and

that, even resolving factual disputes most favorably to defendants, the evidence demonstrated that the pickup was available for Munson's regular use and that, at the time of the accident, Munson's use of the pickup violated the terms of Foley's permission. Accordingly, plaintiff moved for a directed verdict as to both of the controlling coverage issues. Conversely, defendants asserted that the pertinent policy provisions were ambiguous; that there were material issues of disputed fact as to coverage; and that the resolution of those ambiguities and disputes was for the jury. The court denied plaintiff's motion for directed verdict. Thereafter, in instructing the jury, the court provided definitions of the two policy terms at issue and directed the jury to determine whether the facts fell within those definitions.[4] The jury returned the following special verdict responses:

> "1.  Did John Munson have sufficient reason to believe he had Helen Foley's permission to be driving her pickup at the time of the accident?
>
> "ANSWER:   Yes
>
> "2.  Was Helen Foley's pickup furnished or available for John Munson's regular use?
>
> "ANSWER:   No"

The court entered judgment for defendants as to coverage under both Munson's and Foley's policies and awarded attorney fees to defendants Munson and Goddard.

On appeal, plaintiff raises 27 assignments of error, 25 pertaining to the trial of the two coverage issues and two contesting the allowance of attorney fees.[5] We consider, in turn, those assignments of error pertaining to coverage under (1) Munson's policy and (2) Foley's policy.

Plaintiff's first assignment of error challenges the court's denial of its motion for a directed verdict on the issue of coverage under Munson's policy, i.e., the "available for regular use" issue. Plaintiff asserts that the meaning of that

---

[4] Those instructions are set out below. 145 Or App at 522-23.

[5] As described below, our disposition of the coverage-related issues obviates any need to address plaintiff's assignments pertaining to the attorney-fee awards. 145 Or App at 533.

term was unambiguous and that, even viewing disputed evidence concerning the availability of Foley's pickup for Munson's use, and the nature and frequency of that use, in the light most favorable to defendants, the pickup was "furnished or available for [Munson's] regular use" within the meaning of the policy. Defendants respond, as they did before the trial court, that the operative "available for regular use" language is ambiguous and that it was for the jury to resolve that ambiguity, taking into consideration disputed evidence regarding Munson's actual use. Defendants further argue, in related fashion, that our holding and directions on remand in *Munson I* compelled submission of the coverage issue to the jury and preclude plaintiff from asserting that that submission was erroneous.

■■ Defendants' contention that the meaning or content of the "available for regular use" exclusion was ambiguous and, thus, was for the jury to determine cannot be squared either with general principles of policy construction or with the particular procedural posture of this case. Defendants' argument misapprehends the respective roles of court and jury in determining coverage disputes. In general,[6] the interpretation of policy language—that is, the determination of its scope and content—is a matter of law, committed to the court, and not to the jury. *See Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 469, 836 P2d 703 (1992); *Smith v. State Farm Insurance*, 144 Or App 442, 927 P2d 111 (1996). That determination is to be made in accordance with the principles enunciated in *Hoffman*. Among those principles is *Hoffman*'s directive that, if policy language is ambiguous "in the light of, among other things, the particular context in which that term is used in the policy and the broader context of the policy as a whole," then, as a "last step," the *court* is to apply the maxim that ambiguities are to be resolved in favor of coverage. 313 Or at 470. *See also Mutual of Enumclaw Ins. Co. v. Hemsoth*, 134 Or App 611, 616-17, 896 P2d 607, *rev den* 322 Or 167 (1995). Thus, the resolution

---

[6] That is, in the absence of extrinsic evidence of "customized" negotiation between the insured and the insurer. *See Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978) (generally, construction of insurance contract is a question of law, but if technical words, local phrases or terms of art are used, the question becomes one of fact).

of ambiguities in generic, noncustomized policy language is for the court, and not for the jury. That approach is eminently sensible as insuring uniformity of construction of generic terms; committing that function to the jury could result in different juries giving the same uniform policy language different, and conflicting, significance in different cases.

■ If, but only if, there are disputed issues of material fact as to whether the particular circumstances or historical facts fall within the court's "matter of law" determination of the policy's content, the jury, as trier of fact, is to resolve those factual disputes:

> "Whether the decision is for judge or jury follows the familiar pattern. In situations in which 'accident' or 'accidental' are not defined in the policy, it is for the court to decide the definition which is properly applicable to the particular factual situation, taking into consideration what we believe to be the popular non-technical understanding of the term. If the evidence discloses that no reasonable jury could find that a view of the facts most favorable to plaintiff is within the definition established by the court, a verdict should be directed by the court for the defendant. If the undisputed facts clearly come within the definition, a judgment should be directed for plaintiff. If the facts are disputed, or if varying legitimate inferences can be drawn from established facts, the question is one for the jury." *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 103-04, 585 P2d 657 (1978).

The concurrence disputes the foregoing description of the respective roles of court and jury *vis-a-vis* the construction and application of generic, noncustomized provisions in form insurance policies. However, the concurrence does not contend that that methodology, as prescribed in both *Botts* and *Hoffman*, is intrinsically incorrect. Indeed, the concurrence implicitly acknowledges that that methodology is principled, prudent, and practical. Rather, the concurrence asserts that, however sensible that methodology, and regardless of its fidelity to *Botts* and *Hoffman*, it cannot be reconciled with an alternative strand of Supreme Court case law.

The concurrence's criticism fails in several material respects. First, it does not explain why, when the only issue is the meaning of generic policy language, and particularly

where the only evidence of intent is the language itself, *Hoffman*'s "tie breaker," that ambiguities are to be resolved in favor of coverage, 313 Or at 470, does not end the matter. Bluntly: Once the "tie" pertaining to ambiguous language has been "broken," there is nothing more to do in *construing* the policy. The issue then becomes one of application, *i.e.*, of determining whether the circumstances of the particular claim fall within the ambit of the court's "matter of law" determination of the policy's content.

Second, the concurrence does not refer to any post-*Hoffman* case in which this court or the Supreme Court has held that, where the only evidence of the parties' intent is the policy language itself, ambiguities in standard policy language can, should, or must be resolved by a jury.[7] Indeed, we have repeatedly applied *Hoffman*'s methodology in such circumstances. *See, e.g., Mutual of Enumclaw Ins. Co. v. Hemsoth; Anderson v. First Farwest Life Ins. Co.*, 133 Or App 212, 217, 890 P2d 999, *rev den* 322 Or 167 (1995). The most recent and most explicit of those applications was *Smith v. State Farm Insurance*, which considered whether plaintiff's sailboard was a "watercraft" as that term was defined in the insurance policy. In that case, which was decided without objection by this panel within the last two months, we observed:

> "First, because 'watercraft' is not defined in the policy, the court must, as a matter of law, determine the meaning of that policy term *in accordance with the principles enumerated in Hoffman Construction Co. v. Fred S. James & Co*[.]
> Second, if there are disputes of material facts as to whether

---

[7] The concurrence refers to *Interstate Fire v. Archdiocese of Portland*, 318 Or 110, 864 P2d 346 (1993). There, the court, in responding to questions of insurance construction certified by the Ninth Circuit, declined to construe particular policy provisions but, instead, referred the Ninth Circuit to *Hoffman*'s methodology. In so doing, the court observed that,

> "if the first six steps of the *Hoffman* methodology fail to resolve an ambiguity in the meaning of the policy, what remains *could* be a factual issue—the parties' intent—as to which an award of summary judgment might be inappropriate." 318 Or at 118 (emphasis supplied; citation omitted).

The court's purpose in adding that observation is not entirely clear. We understand it, however, to refer to circumstances in which, because the parties have proffered conflicting versions of the circumstances surrounding the policy's negotiation and formation, the trier of fact must resolve those factual disputes and, in so doing, determine the parties' true intent with respect to the ambiguous policy language.

the particular circumstances of 'historic facts' fall within the scope of the court's *matter of law definition*, the trier of fact must resolve those disputes." *Smith*, 144 Or App at 445-46 (emphasis supplied; citations omitted).

Third, the concurrence's view of the Supreme Court's case law invites chaos—or, at least, gross inconsistency. According to the concurrence, identical issues of ambiguity can properly be resolved either by the court, as a matter of law, or by the jury, as a matter of fact. The concurrence freely acknowledges that it can divine no guiding principle as to when the question is one for the court, or one of the jury, 145 Or App at 537—thus, such matters are, presumably, to be decided randomly.

In a related sense, the concurrence, by permitting such questions to be resolved by the jury, creates the distinct possibility that identical policy language will be construed differently, *as a matter of fact*, by juries in Astoria and Ontario and Eugene. Automobile owners or homeowners who are insured under the same standard "adhesive" policy terms will be entitled to different coverage depending on each jury's decision—and, because each of those decisions will rest, ultimately, on a finding of "fact" as to "intent," neither this court nor the Supreme Court could impose any degree of uniformity through appellate review and revision. That is precisely the vice that *Hoffman* is designed to avoid.

■     We reiterate: Whatever *Hoffman* may mean at its margins, *see, e.g.*, *Interstate Fire v. Archdiocese of Portland*, 318 Or 110, 864 P2d 346 (1993), it is clear that construction of nonnegotiated standard policy language is a matter for the court and not for the jury.

We turn again to the particulars of this case. Here, the trial court did not explicitly, as a matter of law, determine the scope and content of the "available for regular use" exclusion. However, the court did instruct the jury on the meaning of that term as follows:

> "In order to determine if there is coverage for Mr. Munson under his own insurance policy for this accident, the Court needs you, the jury, to decide if Mrs. Foley's pickup truck was available for Mr. Munson's regular use. I will instruct

you on what the phrase 'available for regular use' means. You must decide if it applies to the facts in this case.

"The phrase 'available for regular use' means a person can use the vehicle for the purposes authorized by the owner on more than an infrequent or occasional basis.

"In determining whether the pickup was available, you should determine how often Mr. Munson could have used the pickup regardless of whether he actually used it. A vehicle may be available for use even if it is not actually used."

Neither party excepted to that instruction (hereafter the "regular use" instruction), much less assigned or cross-assigned it as error on appeal. Thus, for purposes of this case,[8] plaintiff's asserted entitlement to a directed verdict on the first coverage issue reduces to a single inquiry: Does the evidence, even when viewed in the light most favorable to defendant, demonstrate that Munson *could* have[9] used Foley's pickup "for the purposes authorized [by Foley] on more than an infrequent or occasional basis?" If so, the trial court should have granted plaintiff's motion for a directed verdict as to coverage under Munson's policy. *See Brown v. J. C. Penney*, 297 Or 695, 705, 688 P2d 811 (1984).

Before reaching that question, however, we must address defendants' contention that our analysis and directions on remand in *Munson I* precluded plaintiff from even seeking a directed verdict on coverage issues. Defendants assert that *Munson I* conclusively determined that resolution of the coverage disputes turned on disputed issues of fact and, thus, that granting a directed verdict on those issues would be improper. Invoking "law of the case" principles, defendants assert that *Munson I* settled that question and that it cannot be revisited in this appeal.

Defendants are mistaken. *Munson I* did not preclude a directed verdict on the "available for regular use" issue. In *Munson I*, as noted, *see* 145 Or App at 516-17, the trial court, after denying the parties' request for a jury trial, determined

_____

[8] Because neither party excepted to the court's "regular use" instruction, we necessarily assume, but do not decide, the correctness of that instruction.

[9] The "regular use" instruction explicitly states that the material consideration is "how often Mr. Munson could have used the pickup, regardless of whether he actually used it."

that (1) there was coverage under the Foley policy (*i.e.*, that Munson's use of the pickup at the time of the accident was permissive); but (2) there was no coverage under the Munson policy (*i.e.*, the pickup was available for Munson's regular use). When plaintiff appealed the former determination, defendants cross-appealed the latter, assigning error, *inter alia*, to the court's denial of a jury trial on whether the pickup was available for Munson's regular use.[10] In disputing the cross-appeal, plaintiff asserted that defendants' description of the facts was "misleading" and that evidence presented by plaintiff "unequivocally" proved that Foley's pickup was available for Munson's regular use. Finally, defendants, in support of their cross-appeal, asserted, in part, that "the recitation of the evidence given by Farmers on this issue is somewhat misleading." Faced with those contentions, we concluded that there were "additional factual questions remaining" as to the regular use issue "that the parties are entitled to have decided by a jury." 127 Or App at 420.

Two aspects of the parties' briefing, and of our holding, in *Munson I* are striking. First, plaintiff did not argue there, as it does here, that, even viewing the evidence most favorably to defendants, plaintiff was nevertheless entitled to judgment on the "available for regular use" issue. Rather, plaintiff relied on a description of the facts, which defendants characterized as self-serving and "misleading." Second, our opinion in *Munson I* did not purport to define the scope and meaning of the "available for regular use" exclusion. Indeed, other than a citation to *Wallace Co. v. State F. M. Auto Ins. Co.*, 220 Or 520, 526, 349 P2d 789 (1960), we did not allude to the substantive content of that provision. Here, in contrast, the content of that provision was, and is, fixed by virtue of the unexcepted-to "regular use" instruction.

Those distinctions, in combination, render the "denial of a directed verdict" here materially different from the "denial of a jury trial" issue in *Munson I*. Here, unlike in

---

[10] The positions of the various defendants in *Munson I* differed somewhat. Defendant State Farm asserted simply that the court erred in denying a jury trial on the Munson policy issue. Conversely, defendants Munson and Goddard argued, alternatively, that *defendants* were entitled to prevail as a matter of law on the Munson policy coverage issues or, failing that, that they were at least entitled to a jury trial on that issue.

*Munson I*, there is a clear matter of law reference, *i.e.*, the "regular use" instruction, against which to test the evidence. Here, unlike in *Munson I*, plaintiff argues that, even if a jury were to resolve all evidentiary conflicts in defendants' favor, the facts still fall within the scope of the "available for regular use" exclusion as delineated by the "regular use" instruction. Thus, *Munson I* did not preclude plaintiff from moving for a directed verdict on the "regular use" issue.

■ We turn, then, to whether that motion should have been granted. Viewed most favorably to defendants, the evidence established the following facts: Beginning in 1987, Foley made her pickup available to Munson for farm-related uses, both on and off the tree farm. Foley placed a spare key to the pickup in the farm's workshop for Munson's use. If Munson intended to use the pickup for farm-related purposes, he was not required to obtain Foley's specific permission. If, however, Munson wished to use the pickup for personal purposes, unrelated to the farm, he had to obtain Foley's express permission. The only condition or restriction that Foley imposed on Munson's use of the pickup was that Munson was not to drive the pickup when he believed that he was intoxicated.

In the first 10 months of 1987, preceding the accident, Munson worked on the farm at least 100 times. In the great majority of those instances, Munson drove the pickup. On at least 15 occasions, when Munson drove the pickup off the farm and "into town," for farm-related purposes, he kept the pickup at his home overnight and drove it back to the farm the following morning.

In the light of that evidence, the jury could not reasonably have returned a verdict for defendants with respect to coverage under Munson's policy. *See Johnson v. Jeppe*, 73 Or App 430, 436, 698 P2d 1020 (1985) (function of trial court is to determine whether jury could reasonably find for nonmoving party from evidence presented). Even viewed most favorably to defendants, the evidence unequivocally established that Munson could "use the vehicle for the purposes established by the owner on more than an infrequent or occasional basis." Thus, the pickup was "available for [Munson's] regular use," as the parties mutually defined that term.

The court erred in denying plaintiff's motion for a directed verdict on that issue.[11]

■■ The second broad coverage issue is whether there was coverage under Foley's policy—and, specifically, whether Munson was driving the pickup within the scope of Foley's permission at the time of the accident. Plaintiff's second, third, and fourth assignments of error all challenge the trial court's exclusion of evidence that, plaintiff asserts, was material to that issue. As amplified below, we agree with plaintiff that the court erred in excluding the disputed evidence and that that error was reversible error.

Before addressing the particulars of plaintiff's second through fourth assignments of error, some context is useful: Both during the original proceedings in *Munson I* and, again, on remand, the parties hotly disputed the exact nature of Foley's limitations on Munson's permissive use of the pickup. All parties agreed that Foley placed an alcohol use-related restriction (the "drinking and driving" rule) on her permission, but they differed as to the content of that restriction. Plaintiff asserted that Foley's "drinking and driving" rule was that Munson was not to drive the pickup if he was intoxicated. Conversely, defendants contended that the "drinking and driving" rule was that Munson was not to drive the pickup if he *believed* that he was intoxicated. Thus, under defendants' characterization of the "drinking and driving" rule, if Munson was, in fact, intoxicated, but nevertheless did not believe that he was intoxicated, his use of the pickup did not violate Foley's restrictions and, consequently, was permissive for coverage purposes. There was evidence to support the parties' contending, and conflicting, characterizations of the rule.[12]

In addition to disputing the content of the "drinking and driving" rule, the parties also presented—or attempted to present—conflicting evidence as to the degree of Munson's

---

[11] Because of our disposition of the first assignment of error, we do not reach plaintiff's assignments of error nine through 12, which pertain to the trial court's failure to give certain jury instructions regarding coverage under Munson's policy.

[12] At various times, Foley and Munson testified as to different versions of the "drinking and driving" rule.

inebriation at the time of the accident. Defendants do not dispute that Munson was, in fact, legally intoxicated when the accident occurred. Munson testified that he had drunk 8-10 beers before the accident, but he further testified that, at that time, he did not *believe* that he was intoxicated. Thus, if the jury adopted defendants' view of the "drinking and driving" rule and found Munson credible, it would conclude that his use was permissive.

Conversely, plaintiff sought to present evidence showing that Munson's actual consumption was at least double the 8-10 beers he claimed. In particular, plaintiff proffered the expert testimony of Dr. Peter Bentley, who, in an offer of proof, gave the following testimony:

"Q   Dr. Bentley, at my request did you make an analysis of blood-alcohol of John Munson on October 29, 1987?

"A   (Pause).

"Q   Of what his blood-alcohol would have been?

"A   Yes.

"Q   Have you reviewed the blood-alcohol tests that showed a .161 at * * * what time was it? * * *

"A   .161 at 2102, and .131 at 2205.

"Q   And given that, are you able to calculate what * * * the peak blood-alcohol level of Mr. Munson would have been?

"A   Yes. At about 7:15, assuming he didn't drink after the accident, his blood-alcohol would have been about .21.

"Q   * * * What was his blood-alcohol level at the time of the accident?

"* * * * *

"A   About .19.

"Q   And given that Mr. Munson started drinking between one and two in the afternoon, * * * how many beers, this is 12-ounce beers, did Mr. Munson consume between that time and * * * the time of the accident?

"A   Well, if he started drinking at approximately one o'clock, he'd need to drink about 20 bottles of beer. If he

started drinking at about two o'clock, he'd have to drink about 18 and a half bottles of beer."

Plaintiff also offered the testimony of police officers and crime lab personnel regarding the results of two blood alcohol tests Munson took, which provided the foundation for Bentley's testimony. Finally, plaintiff sought to introduce an exhibit documenting the blood alcohol test results.

Defendants objected to the admission of plaintiff's proffered evidence on two grounds. First, objective evidence of the actual level of Munson's intoxication was irrelevant, because the pertinent inquiry was whether, at the time of the accident, Munson subjectively *believed* that he was intoxicated. Second, the evidence was, in all events, cumulative, because other evidence established beyond dispute that Munson was intoxicated at the time of the accident. The trial court agreed with defendants and excluded Bentley's testimony (second assignment of error), the foundational testimony concerning the blood alcohol test (third assignment of error), and the record of the blood alcohol test results (fourth assignment of error). Ultimately, the jury returned a special verdict response that Munson had "sufficient reason to believe he had Helen Foley's permission to be driving her pickup at the time of the accident."[13] Based on that response, the court entered judgment for defendants with respect to coverage under Foley's policy.

On appeal, plaintiff reiterates its argument that the evidence was relevant for the following reasons: (1) Viewed most favorably to defendants, the evidence showed that Foley's "drinking and driving" rule was that Munson could not drive the pickup if he *believed* that he was intoxicated. (2) Munson maintained that he had consumed 8-10 beers, but also maintained that, at the time of the accident, he did not *believe* that he was intoxicated. (3) Contrary to Munson's testimony, the proffered evidence showed that he had actually consumed 18-20 beers, with a blood alcohol level of between

[13] *In returning that verdict, the jury necessarily endorsed defendants' "subjective belief" version of the "drinking and driving" rule. If the jury had adopted plaintiff's "actual intoxication" version of the rule, it would necessarily have returned a verdict for plaintiff, because it was uncontroverted that Munson was, in fact, intoxicated at the time of the accident.*

.19 and .21. (4) That evidence would tend to show, by way of reasonable inference that, having consumed 18-20 beers, Munson, contrary to his assertions, *knew* that he was intoxicated. Thus, plaintiff asserts:

> "To prevail on the permission issue * * * plaintiff had to * * * prove Munson had consumed enough alcohol to establish he had sufficient reason to believe he was in violation of the rule [about drinking and driving] and therefore had sufficient reason to believe he did not have permission. * * *

> "Plaintiff's evidence that Munson had had 18-20 beers instead of the 8-10 he admitted would have dramatically altered the critical issues on permission."

We agree with plaintiff that the evidence is relevant. OEC 401 provides:

> " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The "fact that is of consequence to the determination of the action" here was Munson's subjective awareness that he was intoxicated. Evidence that Munson had drunk 18-20 beers within roughly a five-hour time period tends to make that fact more probable that it would have been without that evidence.

Defendants nevertheless maintain that, even assuming that the evidence was relevant, it was properly excluded as cumulative and prejudicial. OEC 403.[14] *See State v. Meyers*, 132 Or App 585, 587, 889 P2d 374 (1995) (trial court's decision under OEC 403 is reviewed for abuse of discretion). They argue that the jury was already aware that Munson was intoxicated at the time of the accident and that he had admitted to having 8-10 beers. Given that evidence, defendants argue, plaintiff's evidence that Munson had drunk 18-20 beers would not have assisted the jurors in

---

[14] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

determining the material issues and would, instead, have been unfairly prejudicial. We disagree.

The excluded evidence was not cumulative of the issue of whether Munson subjectively believed that he was intoxicated. A jury might reasonably conclude that, while someone who had drunk 8-10 beers might not have believed that he was intoxicated, someone who had drunk 18-20 beers had to have known that he was intoxicated. Thus, in this context—and especially as to the credibility of Munson's testimony that he did not believe that he was intoxicated—there could be a substantial difference between having drunk 8-10 beers and having drunk 18-20 beers.

Nor was the evidence unfairly prejudicial. Given that the jury already knew that Munson was legally intoxicated at the time of the accident, it is difficult to discern how defendants, including the decedent's estate, could have been prejudiced by the jury learning that Munson had actually consumed considerably more beer than he admitted. Defendants have not identified any substantial prejudice flowing from the admission of that evidence. We thus conclude that the evidence that is the subject of plaintiff's second, third and fourth assignments of error was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice or confusion. Consequently, the court erred in excluding that evidence.

We further conclude that that error was reversible error. The excluded evidence went to a central issue—*i.e.*, the believability of Munson's testimony that he did not believe that he was intoxicated at the time of the accident. That testimony was, in turn, critical to defendants' position that, at the time of the accident, Munson, was, in fact, driving within the scope of Foley's permission. *See* 145 Or App at 528 n 13. Because there is some likelihood that the excluded evidence, if admitted, would have affected the jury's verdict, the exclusion of the evidence that is the subject of plaintiff's second, third, and fourth assignments was not harmless error. *Hass v. Port of Portland*, 112 Or App 308, 314, 829 P2d 1008, *rev den* 314 Or 391 (1992). Accordingly, we reverse and remand

for a new trial as to whether there was coverage under Foley's policy.[15]

Although our disposition of assignments of error two through four requires reversal and remand for retrial, issues raised in plaintiff's assignments of error six through eight, 13, and 14, which also pertain to coverage under Foley's policy, may well arise again on remand. Accordingly, we will address those assignments.

■     Assignments of error six through eight challenge the trial court's failure to give certain jury instructions. The sixth assignment of error asserts that the court erred in failing to give the following instruction:

> "If you find Mr. Munson did not believe he was driving the pick-up with Mrs. Foley's permission, he is not entitled to coverage under Mrs. Foley's policy.
>
> "If you find Mr. Munson did believe he had Mrs. Foley's permission, you must then determine if, immediately prior to the accident he had sufficient reason to believe this. *The test is whether a reasonable person, standing in the shoes of Mr. Munson, would have had sufficient reason to believe he had Mrs. Foley's permission to drive her pick-up.*" (Emphasis supplied.)

We conclude that the trial court correctly refused to give that instruction, because the emphasized language is erroneous and misleading in the circumstances of this case. As described previously, Munson's permissive use of the pickup was restricted by Foley's "drinking and driving" rule. Under defendants' version of that rule, which the jury necessarily accepted, *see* 145 Or App at 526, Munson could not drive if he

---

[15] Because of our disposition of plaintiff's assignments of error two through four, we need not consider plaintiff's fifth assignment of error, which contends that the trial court erroneously excluded testimony by a police officer present at the accident scene that Munson had a breath sweetener in his mouth. On appeal, plaintiff contends that that evidence was relevant as to the issue of Munson's possible consciousness and belief that he was intoxicated at the time of the accident. We note, as to that assignment of error, that the trial court excluded the testimony not because it was irrelevant, but because plaintiff's inquiry that adduced that testimony exceeded the proper scope of cross-examination. Plaintiff's "relevance" argument on appeal does not address, much less dispute, the trial court's actual basis for excluding the evidence.

*subjectively believed* that he was intoxicated. The emphasized language of the requested instruction, by directing the jury to consider what an objectively reasonable person would have believed, rather than what Munson actually, subjectively believed, would have impermissibly skewed the jury's inquiry.

Plaintiff's seventh and eighth assignments of error pertain to the trial court's refusal to give additional requested instructions regarding coverage under Foley's policy. We affirm the court's rejection of those instructions without further discussion.

■ Plaintiff's 13th and 14th assignments of error[16] assert that the trial court erred in giving the following instructions:

> "An insurance policy should be interpreted according to the understanding of the ordinary purchaser.
>
> "* * * * *
>
> "If there is an ambiguity in the terms of an insurance policy, any reasonable doubt as to the intended meaning of such terms should be resolved against the insurance company in favor of extending coverage to the insured."

Plaintiff argues that those instructions are restatements of principles of construing insurance policies—and that such construction is a matter for the court, not the jury. *See St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 192-93, 923 P2d 1200 (1996). Defendants respond that the instructions merely "gave the jury a legally correct general framework for deciding * * * specific factual issues." Although the instructions may be "legally correct" as an abstract proposition, they are superfluous and potentially highly confusing with respect to the jury's proper role *vis-a-vis* the court in insurance coverage disputes. Those instructions should not be given in the event of retrial on remand.

Plaintiff's 15th through 24th assignments of error pertain to evidentiary issues and related jury instructions

---

[16] As noted above, 145 Or App at 526 n 11, plaintiff's ninth through twelfth assignments of error challenged rulings pertaining to coverage under Munson's policy.

that, depending on the development of the record, may not arise again on remand and retrial. Because any "guidance" we might offer on these issues is of uncertain value, we decline plaintiff's invitation to reach those assignments. *See generally State v. Walker*, 140 Or App 96, 101, 914 P2d 8 (1996).

Plaintiff's final two assignments of error, numbers 26 and 27, challenge the trial court's allowance of attorney fees to defendants Munson and Goddard. Given our disposition on the merits—*i.e.*, our determination that (1) there is no coverage under Munson's policy; and (2) the judgment of coverage under Foley's policy must be reversed and remanded for retrial—the fee awards to Munson and Goddard must be vacated.

Reversed as to the declaration that Munson is afforded coverage under Munson's policy; reversed and remanded for retrial as to the declaration that Munson is afforded coverage under Foley's policy; attorney-fee awards to Munson and Goddard vacated.

**DEITS, P. J.,** concurring.

I agree with the holding and most of the reasoning in the lead opinion. However, I am unable to agree with its *dicta* stating that the meaning of ambiguous language in standard (*i.e.*, "non-negotiated") insurance policy provisions can *never* be a question for the trier of fact. 145 Or App at 519-20. Although there is considerable logic to the lead opinion's proposition and the rule it espouses would promote consistency in the way that standard policy provisions are applied, there are controlling decisions by the Supreme Court that are to the contrary.

Over the years, the Supreme Court has articulated a number of ways by which the meaning of ambiguous provisions in insurance contracts may be resolved. Whether those methods are consistent with one another or have been applied in a consistent manner is a question I will discuss briefly later in this opinion. However, if there are problems in that regard, *this* court can do little about them. For purposes of discussion, I will note only two examples of the various methods the Supreme Court has endorsed. One is to construe

ambiguous policy language against the insurer. A second is to submit the question to the trier of fact, to determine the meaning of the ambiguous language by reference to the parties' intent.[1] Under the lead opinion's analysis, that second method could *never* be employed. Yet the Supreme Court has held on numerous occasions that it may be.

The court stated in *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or 639, 643, 576 P2d 1244 (1978):

> "As a general rule the construction of a contract, including an insurance contract, is a question of law. *May v. Chicago Insurance Co.*, 260 Or 285, 292-94, 490 P2d 150 (1971). The exception to this rule is that *if the language of the contract is ambiguous,* or if technical words, phrases or terms of art are used and evidence is properly admitted showing meaning, *the question becomes one of fact. Libby Creek Logging, Inc. v. Johnson,* 225 Or 336, 339, 358 P2d 491 (1960)." (Emphasis supplied.)

Similarly, the court stated in *Zingani v. Frost*, 273 Or 774, 776, 543 P2d 674 (1975), that, "[i]f the language of the binder is considered uncertain * * *, interpretation of the coverage of the binder becomes a question for the trier of fact." *See also, e.g., Western Fire Insurance Co. v. Wallis*, 289 Or 303, 313, 613 P2d 36 (1980) (Tongue, J., dissenting); *May v. Chicago Insurance Co.*, 260 Or 285, 292-94, 490 P2d 150 (1971).

To the extent it acknowledges that the Supreme Court has *ever* stated the rule I have described, the lead opinion suggests implicitly that all of that changed with the court's opinion in *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or 464, 836 P2d 703 (1992). The plaintiff insureds in that case argued that the court should adopt their proffered interpretation of certain policy language "under the rule that ambiguous terms contained within an insurance policy are to be construed against the insurer, who drafted

---

[1] By using the word "meaning," I do not imply that the factfinder could ever be called upon to *articulate* in its findings or verdict what the ambiguous term is to be understood as saying. Rather, where there is evidence of intent and of other critical facts, it could become the factfinder's role to decide whether there is coverage, and that decision could entail a determination of which of two or more arguable meanings of the ambiguous provision is the one to which the parties agreed.

the policy." *Id.* at 469-70. The court then turned to the question of whether the policy *was* ambiguous and, after fashioning an elaborate analytical method for determining if an ambiguity exists, concluded that the language in question was unambiguous. Hence, the principle of construing ambiguous language against the insurer, which the plaintiffs had urged the court to apply, could not come into play.

The lead opinion appears to understand *Hoffman* as meaning that, when there *is* an ambiguity, the principle of construing it against the insurer is the *only* device for resolving it that remains extant, and that principle is one for the court rather than a factfinder to apply. Under the lead opinion's reading of *Hoffman,* whatever other means for resolving ambiguities that might have existed before that decision, *e.g.,* a jury's determination of the parties' intent, did not survive.

I do not read *Hoffman* as cutting that deeply or broadly. The opinion in no way suggests that it is meant to overrule the cases that I have discussed regarding the factfinder's potential role in resolving ambiguities. The insureds' argument in *Hoffman* was that they should prevail under the principle of construing ambiguities against the insurer. The court rejected the argument, because it concluded that there was no ambiguity. However, in my view, the court did not intend by that conclusion to hold that, *whenever* an ambiguity exists, the *only* method for resolving it is for the court to apply that principle. Stated another way, the court rejected the insureds' premise that there was an ambiguity and, therefore, it rejected the only argument that the insureds advanced for resolving the putative ambiguity in their favor. I simply do not believe that the court held or implied that all the other means for resolving ambiguities that had been recognized in its cases had ceased to exist.

It is unnecessary, however, for us to debate whether the lead opinion's or my reading of *Hoffman* is the "right" one, because the Supreme Court itself provided the answer in its later opinion in *Interstate Fire v. Archdiocese of Portland,* 318 Or 110, 864 P2d 346 (1993). It stated:

"The method by which an insurance policy is to be construed has been discussed thoroughly by this court in the

court's recent decision of *Hoffman Construction Co. v. Fred S. James & Co.*, [313 Or 464, 836 P2d 703 (1992)]. We see no need to repeat that discussion here. We add to that discussion two points. First, we note that reference to precepts of Oregon tort law as a means of defining policy terms is appropriate only if the policy expressly or by clear inference implicates those precepts. Second, we note that, if the first six steps of the *Hoffman* methodology, *id.* at 474-75, fail to resolve an ambiguity in the meaning of the policy, *what remains could be a factual issue — the parties' intent — as to which an award of summary judgment might be inappropriate*." 318 Or at 117-18. (Emphasis supplied.)

Clearly, if *Hoffman* was meant to hold that the principle of construction against the insurer becomes automatically and exclusively dispositive whenever there is an ambiguity, the question of the parties' intent could not be a material factual issue. Further, summary judgment would not be "inappropriate" if the final determination of the meaning of the ambiguous language could only be made by the court and could only be adverse to the insurer. In my view, *Interstate Fire* makes it plain that, by referring to the particular method for resolving ambiguities that was argued to it in *Hoffman*, the court did not suggest that the other historical methods for doing so— such as the one contemplated in *Interstate Fire* and in the pre-*Hoffman* cases I have discussed—were nullified by *Hoffman*.

The lead opinion appears to draw a distinction between "generic" standard policy language and "customized" or negotiated terms and suggests that questions of intent and meaning might be jury questions only in connection with the latter but cannot be in connection with the former. That suggestion, too, is contrary to the Supreme Court's holdings. In *May* and *Interstate Fire*, among other cases where the court has held that questions of intent and/or meaning were or could be for the factfinder, the language in question was standard policy language.

The lead opinion also relies on *Botts v. Hartford Acc. & Indem. Co.*, 284 Or 95, 585 P2d 657 (1978), for the thesis that the jury *may* be charged with finding "historical facts," *i.e.*, those pertaining to whether events occurred that come within the meaning assigned to ambiguous policy provisions

by the court, but may not be charged with the task of identifying the intended meaning of the provisions. Accepting for argument the proposition that *Botts* refers only to questions of the former kind, I do not agree with the lead opinion's conclusion that it thereby negates the possibility that questions of the latter kind can also be for the jury—as other decisions by the court, both before *Botts* and after, plainly indicate they can be. In my view, *Botts* does not state that *only* questions of the kind described in the lead opinion's quotation from it *can* be for the jury; rather, it simply states that those questions *are* jury questions. My disagreement with the lead opinion's understanding of *Botts* is quite similar to my disagreement with the way in which it reads *Hoffman*: in both instances, the lead opinion understands the court to have said that, because one thing *is*, everything else *is not*.

As indicated earlier in this opinion, it is not entirely clear to me when or why, in particular cases, the Supreme Court has chosen one method for resolving ambiguities instead of the other. With little or no explanation, in some instances it has chosen to apply the principle of construction against the insurer while, in others, the meaning of ambiguities has been treated as a question of intent for the factfinder. It may be that the best indication of where the line should be drawn is to be found in our statement in *First Far West Transp. v. Carolina Casualty Ins.*, 47 Or App 339, 343, 614 P2d 1187 (1980) (citing, *inter alia, I-L Logging Co. v. Mfgrs. & Whlse. Ind. Exc.*, 202 Or 277, 273 P2d 212, 275 P2d 226 (1954)):

> "[T]he rule of liberal construction in favor of the insured is subordinate to the rule that with insurance contracts, as with other contracts, the primary and governing consideration is to ascertain the intent of the parties."

Wherever the line might be, however, it is clear that the court has said that questions regarding the meaning of ambiguous standard policy provisions are at least sometimes factual ones for the trier of fact, and it has reiterated those statements often and recently. I cannot agree with the lead opinion's conclusion that we may say the opposite.