AOYAGI, J.
*488 In this breach of contract action, the trial court granted summary judgment in *317 favor of plaintiff, and defendant[1] appeals the resulting judgment. Defendant contends that the contract at issue is ambiguous as a matter of law, that it must be construed against plaintiff because it is an insurance contract, and that the trial court erred in granting summary judgment in favor of plaintiff. We conclude that the contract is unambiguous and that the trial court did not err. Accordingly, we affirm.
Summary judgment is appropriate when no genuine issue of material fact exists for trial and the moving party is entitled to prevail as a matter of law. ORCP 47 C. The parties agree that their dispute turns on purely legal aspects of contract interpretation. There are no disputed facts.
Oregon Employers Trust, Inc. (OET) operated a workers' compensation and employers' liability coverage pooling arrangement, which is essentially a form of insurance. Approximately 285 companies participated in OET's pool during the time period relevant to this appeal. Defendant joined the pool on October 1, 2010. At that time, defendant entered into a Workers' Compensation and Employers Liability Self-Insured Group Coverage Pooling and Indemnity Agreement (Pooling Agreement), which governed the terms of defendant's participation. Part Six, Condition G, of the Pooling Agreement, titled "Assessments," provides:
"[OET's] Board of Directors may, in its sole discretion, at any time impose assessments upon you and our other Participants or former Participants subject to assessment. Assessments may also be imposed upon order of the Director of the Department of Consumer and Business Services Workers' Compensation Division for the State of Oregon.
*489 "Further, I (We) understand and agree that should I (We) terminate from the group that I (We) will continue to be jointly and severally liable for the payment of any compensation due to a subject worker and other amounts due to the Department of Consumer and Business Services, Workers' Compensation Division when such compensation and other amounts arise out of a period when I (We) was (were) a participant(s) of the group.
"It is further understood and agreed that if an order is issued by the Department of Consumer and Business Services, Workers' Compensation [Division] declaring the group to be in noncompliance under the provision of ORS 656.017, that I (We) shall be jointly and severally liable for any civil penalties assessed under ORS 656.735 and any claim costs incurred under ORS 656.054.
"You are assessable while this agreement is in effect and for three years following its termination."
The cover page of the agreement also references Part Six, Condition G, immediately above the parties' signatures: "The features of this Pooling Agreement include the possibility of joint & several liability with assessments and payments after termination of the Participant's participation as detailed in Part Six (pg. 9)-Conditions / 'G' Assessments noting provisions of ORS 656.017 / 656.735 / 656.054."
Defendant was in the OET pool for two years. In late September 2012, defendant notified OET that it wished to "cancel" its participation. OET responded a few days later that it would be "non-renewing" defendant's agreement and membership "effective October 01, 2012 at 12:01 a.m. because of coverage placed elsewhere." Defendant ceased participation in the OET pool on October 1, 2012.
In 2013, the state increased its capitalization requirements for risk pools such as OET. As a result, OET had to increase its capitalization from $3,275,000 to $3,950,000. To timely meet the new requirements and avoid decertification, OET initially borrowed money and then, in September 2013, issued a *318 12% assessment against current and former pool participants for the policy years 2011 and 2012. Defendant objected to the assessment and did not pay the amount assessed against it. *490 By mid-2014, the number of participants in OET's pool had dropped substantially, and, as a result, OET's board voted to decertify the pool. At that time, the state entered into a claims management agreement with OET's administrator to continue administering the pool's funds, including paying covered workers' compensation claims that had arisen while the pool was active.
OET assigned to plaintiff its claim against defendant for the unpaid 2012 assessment. Plaintiff filed this action for breach of contract and soon moved for summary judgment. Plaintiff argued that defendant was obligated to pay the 2012 assessment under the terms of the Pooling Agreement. Defendant opposed the motion, contending that the agreement was ambiguous as to OET's authority to impose the assessment and that the ambiguity should be construed in defendant's favor because of the interpretive rules applicable to insurance policies. Ultimately, the trial court agreed with plaintiff, granted summary judgment, and entered a judgment in plaintiff's favor.
Defendant appeals that judgment, assigning error to the grant of summary judgment. The primary issue on appeal is whether the Pooling Agreement, particularly Part Six, Condition G, is ambiguous as to OET's authority to impose the 2012 assessment on defendant. Whether a contract term is ambiguous is a question of law. Heathman Hotel v. McCormick & Schmick Restaurant , 284 Or. App. 112, 117, 391 P.3d 892 (2017) (contracts generally); Hoffman Construction Co. v. Fred S. James & Co. , 313 Or. 464, 470, 836 P.2d 703 (1992) (insurance policies). The correct interpretation of an unambiguous term also is a question of law. Heathman Hotel , 284 Or. App. at 117, 391 P.3d 892 (contracts generally); Hunters Ridge Condo. Assn. v. Sherwood Crossing , 285 Or. App. 416, 422, 395 P.3d 892 (2017) (insurance policies).[2]
*491 Defendant contends that, contrary to the trial court's ruling, Part Six, Condition G, is ambiguous in two regards. First, defendant argues that it is ambiguous whether OET has discretion to assess pool participants for any legitimate business purpose, including increasing OET's capitalization to meet state regulatory requirements, or whether OET may only assess participants for the limited purposes identified in the second paragraph of Part Six, Condition G. Second, defendant argues that it is ambiguous whether former participants who "cancel" their agreements are subject to assessment after leaving the pool, or whether only former participants whose agreements are "terminated" are subject to assessment after leaving the pool.
We address each of the alleged ambiguities in turn. Regarding the purposes for which OET may make assessments, the full text of Part Six, Condition G, is set forth above. The first paragraph provides that OET's board of directors "may, in its sole discretion, at any time impose assessments upon you and our other Participants or former Participants subject to assessment." Assessments "may also be imposed" upon order of the director of the Workers' Compensation Division of the Oregon Department of Consumer *319 and Business Services (WCD). "Further," the second paragraph states, the participant understands that if it "terminate[s] from the group," it will "continue to be jointly and severally liable for the payment of any compensation due to a subject worker and other amounts due to the [WCD]" arising out of a period when it was in the group. The third paragraph states that it is "further understood and agreed" that defendant shall be jointly and severally liable for certain civil penalties and claim costs in the event of a DCBC noncompliance order. Finally, the fourth paragraph concludes, "You are assessable while this agreement is in effect and for three years following its termination." *492 Defendant acknowledges that one plausible reading of Part Six, Condition G, is that it gives OET broad discretion to assess participants for any legitimate business purpose while the agreement is in effect and for three years following its termination. That is the interpretation that plaintiff urges and that the trial court adopted. Defendant argues, however, that there is a second plausible interpretation that would lead to a different result. Specifically, defendant posits that the second paragraph may be read as limiting the discretion granted in the first paragraph, such that OET only has authority to assess participants for compensation payments to subject workers and for amounts due to the WCD. Plaintiff rejects that alternative interpretation as implausible, especially in the context of the Pooling Agreement as a whole. See Milne v. Milne Construction Co. , 207 Or. App. 382, 388, 142 P.3d 475 (2006) ("A contract provision is ambiguous if it has no definite significance or is capable of more than one plausible-that is, sensible and reasonable-interpretation."); Holloway v. Republic Indemnity Co. of America , 341 Or. 642, 650, 147 P.3d 329 (2006) (a term in an insurance policy is ambiguous only if it has "more than one plausible interpretation" and "only if [the] two or more plausible interpretations of that term withstand scrutiny" after examination in context).
We agree with the trial court that defendant's proposed second interpretation of Part Six, Condition G, is implausible. The first paragraph expressly states that OET's board has "sole discretion" to impose assessments against current and former participants subject to assessment, while the fourth paragraph imposes a three-year time limit on when former participants are subject to assessment. The broad grant of discretion in the first paragraph would be meaningless if the very next paragraph took it away and limited assessments to covering payments to injured workers and to the WCD. Such an interpretation also would be inconsistent with the agreement's use of the word "further" in the second and third paragraphs, which, at least in this context, signals that the second and third paragraphs are additional to the first paragraph.
There are also other problems with defendant's alternative interpretation. One is that it disregards the fact *493 that the second paragraph calls out a particular type of ongoing liability after a participant "terminate[s] from the group." The second paragraph says nothing about current participants, yet defendant argues that it generally modifies the boards' discretion in the first paragraph, including its discretion in assessing current participants. The alternative interpretation also fails to account for the third paragraph of Condition G, which addresses a participant's liability for civil penalties and claim costs if the WCD declares the group in noncompliance under ORS 656.017. That is an express form of liability beyond the scope of the second paragraph that defendant fails to reconcile with its alternative interpretation.
We thus conclude that the trial court did not err in rejecting as implausible defendant's alternative interpretation of Part Six, Condition G. The second and third paragraphs emphasize particular types of payments for which a participant is jointly and severally liable (whether those payments are made through "assessments" or otherwise). The second paragraph in no way purports to restrict the discretion regarding assessments granted in the first paragraph to only the purposes identified in the second paragraph. And, in our view, the grant of "sole discretion" to the board, to at any time impose assessments on current and former participants subject to assessment, cannot be reconciled with that discretion being limited *320 solely to imposing assessments for payments to injured workers and to the WCD. Defendant's alternative interpretation, therefore, is implausible.[3] *494 That brings us to the second alleged ambiguity: whether there is a difference between "cancelled" and "terminated" agreements for purposes of assessing former participants. Part Six, Condition G, provides, "You are assessable while this agreement is in effect and for three years following its termination." Defendant asserts that its agreement was "cancelled," not "terminated," and that the OET board therefore had no right to impose an assessment on defendant after it left the pool. The trial court rejected that argument, and plaintiff urges that we do so as well, concluding that the Pooling Agreement uses "termination" and "cancellation" interchangeably.
It is certainly true that a contract could use "cancellation" and "termination" to refer to distinct events. They are not perfect synonyms. We cannot say, however, that the Pooling Agreement uses them in such a manner. Viewing the agreement as a whole, the terms are used interchangeably in this contract.
We begin with the "Cancellation/Termination" provision of the agreement, which is Part Six, Condition D. In relevant part, it provides that a participant may "withdraw" from OET after one year of participation. At any time, a participant may be "terminated" in OET's sole discretion for any of three reasons, one of which is failure to make required contributions. OET also may "cancel this agreement." If OET cancels the agreement for "nonpayment of Contributions due," it must give the participant 10 days' advance written notice. "In all other cases," OET must give 30 days' advance written notice. The agreement period will end on the day and hour stated in the "cancellation notice." Any of the foregoing provisions that conflict with a law "that controls the cancellation of the coverage" is to be changed to comply with the law.
Other provisions of the Pooling Agreement also mention "cancellation." Part Five, Condition E, "Contribution," includes a provision that, "[i]f this agreement is cancelled," the amount of the participant's final contribution will be calculated in one manner if OET cancels the agreement and in *495 another manner if the participant cancels it. And Part Six, Condition E, "Sole Representative," pertains to additional insureds and participants acting on behalf of all insureds to, among other things, "give or receive notice of cancellation."
On its face, the Pooling Agreement uses "termination" and "cancellation" interchangeably. The most powerful illustration of that point is in Part Six, Condition D. That provision gives OET sole discretion to "terminate" a participant for failure to make required contributions. However, it also refers to the same event as an act of cancellation, providing that OET "may cancel this agreement" and that, "[i]f cancellation results from the nonpayment of Contributions due ," OET is permitted to give 10 days' written notice rather than the usual 30 days' written notice. (Emphasis added.) The interchangeable use of "termination" and "cancellation" in Part Six, Condition D, is particularly significant because that is the only provision of the Pooling Agreement that addresses and arguably *321 defines "termination," as opposed to simply referencing it.
Although "termination" and "cancellation" are not perfect synonyms, we note that using them interchangeably does not offend their common meanings. The common meaning of "terminate," as relevant here, is "to end formally and definitely (as a pact agreement, contract)." Webster's Third New Int'l Dictionary 2359 (unabridged ed. 2002); see also Black's Law Dictionary 1609 (10th ed. 2014) ("[t]he act of ending something," such as "termination of the partnership by winding up its affairs," or "the end of something in time or existence; conclusion or discontinuance," as in "the insurance policy's termination left the doctor without liability coverage"). The relevant common meaning of "cancel" is "to remove from significance or effectiveness," such as "to destroy the force, effectiveness, or validity of,"e.g. , "cancel an order" or "canceling a magazine subscription." Webster's at 325; see also Black's at 247 ("[a]n annulment or termination of a promise or an obligation; [specifically] the purposeful ending of a contract because the other party has breached one or more of its terms").
It also is worth noting that other provisions of the agreement would be inexplicably incomplete if "cancellation"
*496 and "termination" were read to mean different things. For example, Part Five, Condition E, provides for the method of calculation of the final contributions of departing members whose agreements are "cancelled." It makes no separate provision for members whose agreements are "terminated." Similarly, Part Six, Condition E, requires the "sole representative" of a group of insureds to be responsible for "giv[ing] or receiving notice of cancellation." There is nothing comparable for receiving a notice of termination. Indeed, the only type of notice mentioned in the Cancellation/Termination provision is notice of cancellation, yet it cannot be the case that OET does not have to notify members if their agreements are "terminated."
On the whole, the only plausible interpretation of the Pooling Agreement is that it uses "terminate" and "cancel" interchangeably. That may not be semantically ideal, but it is what the agreement does. We therefore conclude that neither of the alleged ambiguities asserted by defendant exist, and the trial court did not err in granting summary judgment in favor of plaintiff. Defendant's agreement was both "cancelled" and "terminated" on October 1, 2012, and the OET board had authority under Part Six, Condition G, to assess defendant for three years following that date, including for purposes other than payments to injured workers and to the WCD.
Affirmed.

This is a consolidated appeal. There are actually three defendants, all similarly situated, and three appeals. The appeal by defendant Kerr Contractors, Inc. (Kerr), A163697, has been designated as the control case, and defendants Columbia Northwest Recycling, Inc., and Crestline Construction Company, LLC, have agreed that the decision in the Kerr appeal will be dispositive as to all three matters equally. Throughout this opinion, we use "defendant" in the singular to refer to Kerr.

"Insurance policies are contractual in nature and are interpreted, for the most part, like any other business contract." Employers Insurance of Wausau v. Tektronix, Inc. , 211 Or. App. 485, 502-03, 156 P.3d 105 (2007). However, "our method of interpreting an insurance policy deviates somewhat from the interpretation of other contracts in the case of an ambiguity." Id. at 503 n. 9, 156 P.3d 105. At least with respect to "generic, noncustomized policy language," we interpret an ambiguous insurance policy term as a matter of law, in favor of coverage, rather than leaving the resolution of the ambiguity to a fact finder. Farmers Ins. Co. v. Munson , 145 Or. App. 512, 519-20, 930 P.2d 878 (1996). Defendant contends that those special interpretive rules apply to the Pooling Agreement and require us to resolve any ambiguity about the scope of permissible assessments in its favor, even though it is a specialized agreement rather than a form policy and the dispute is not over insurance coverage. Given the parties' arguments on appeal, the only circumstance in which it would matter which set of interpretive rules applies is if we agreed with defendant that the Pooling Agreement was ambiguous. We do not, as described later in the opinion, and therefore do not address which set of rules applies.

Intertwined with its argument about the second paragraph of Part Six, Condition G, defendant argues somewhat more generally that "assessment" has no definite meaning and should be understood in a limited sense that excludes business expenses and capitalization requirements. We are not persuaded. "[T]he liability to pay an assessment is a matter of contract." Rosebraugh v. Tigard et al. , 120 Or. 411, 424, 252 P. 75 (1927). Nothing in the contract limits the meaning of "assessment"-unless we agreed with defendant about the second paragraph of Part Six, Condition G, which we do not, as already discussed. The relevant common meaning of "assessment" is not limited in the manner that defendant advocates but relates to "obligations" generally. See Webster's Third New Int'l Dictionary 130 (unabridged ed. 2002) ("a levy variable in amount collected by insurance companies from certificate or policy holders in order to meet their obligations " (emphasis added) ). We do not see how meeting capitalization requirements imposed by the state was not an "obligation" of OET. See Black's Law Dictionary (10th ed. 2014) (defining "obligation" as "[a] legal or moral duty to do or not do something," including something required by law).