Argued and submitted April 18, on appeal, judgment vacated and remanded with instructions to grant defendant's motion for new trial, limited to punitive damages, unless plaintiff agrees to remittitur of punitive damages to three times compensatory damages award within 28 days of entry of appellate judgment; on cross-appeal, judgment vacated and remanded with instructions to recalculate compensatory damages in accordance with this opinion; otherwise affirmed October 12, 2005, reconsideration allowed by opinion January 18, 2006
See 203 Or App 744, 126 P3d 682 (2006)

Margie A. GODDARD,
as Personal Representative for the Estate of
Marc E. Goddard, Deceased,
*Respondent - Cross-Appellant,*

*v.*

FARMERS INSURANCE COMPANY OF OREGON,
an Oregon corporation,
*Appellant - Cross-Respondent.*

9005-03204; A118750

120 P3d 1260

James N. Westwood argued the cause for appellant - cross-respondent. With him on the briefs were Stoel Rives, LLP, and Thomas H. Tongue and Dunn Carney Allen Higgins & Tongue LLP.

Jeffrey M. Batchelor argued the cause for respondent - cross-appellant. With him on the briefs were Jennifer H. Holcomb, David W. Melville, Markowitz, Herbold, Glade & Mehlhaf, PC, and William A. Barton, Kevin K. Strever, and Barton & Strever, P.C.

Before Haselton, Presiding Judge, and Ortega, Judge, and Deits, Judge pro tempore.

HASELTON, P. J.

## HASELTON, P. J.

This appeal is the latest chapter in remarkably protracted litigation that began with an auto accident in 1987, in which plaintiff's decedent, Marc Goddard, died following a collision with a pickup truck driven by a drunk driver, John Munson.[1] Munson was driving a vehicle insured by defendant Farmers Insurance Company of Oregon. In this case, a jury awarded plaintiff, as assignee of Munson's bad faith claim against defendant, $863,274 in compensatory damages and $20,718,576 in punitive damages, based on defendant's conduct in handling the wrongful death claim against Munson and in failing to settle that claim within policy limits.

Defendant appeals, asserting that the trial court erred in admitting a "pooling agreement" among various Farmers companies and that the jury's award of punitive damages was unconstitutionally excessive under the standards prescribed in *State Farm Mut. Ins. v. Campbell*, 538 US 408, 123 S Ct 1513, 155 L Ed 2d 585 (2003). Plaintiff cross-appeals, challenging various aspects of the trial court's calculation of compensatory damages. As described below, we conclude that the trial court did not err in admitting the "pooling agreement." However, we further conclude that the punitive damage award is unconstitutionally excessive and that the maximum constitutionally permissible award of punitive damages is three times the compensatory damage award. With respect to the cross-appeal, we conclude that the trial court erred in two respects in calculating and reducing the compensatory damage award.

---

[1] *See Goddard v. Munson*, 108 Or App 342, 816 P2d 619, *rev den*, 312 Or 525 (1991) (affirming judgment in wrongful death action); *Farmers Ins. Co. v. Munson*, 127 Or App 413, 873 P2d 370, *rev den*, 320 Or 109 (1994) (reversing judgment in declaratory judgment action regarding applicability of insurance policies to wrongful death claim); *Farmers Ins. Co. v. Munson*, 145 Or App 512, 930 P2d 878 (1996), *rev den*, 325 Or 368 (1997) (affirming in part and reversing and remanding in part judgment following second trial in declaratory judgment proceeding); *Goddard v. Farmers Ins. Co.*, 173 Or App 633, 22 P3d 1224, *rev den*, 332 Or 631 (2001) (reversing grant of summary judgment for defendant insurer in present bad faith litigation); *Goddard v. Farmers Ins. Co.*, 177 Or App 621, 33 P3d 1075 (2001) (denying plaintiff's petition for conditional award of attorney fees based on reversal of summary judgment in wrongful death action).

## I. PROCEDURAL BACKGROUND
## AND HISTORY OF THE LITIGATION

On October 29, 1987, plaintiff's son, Marc Goddard, was killed in a collision with a pickup truck driven by Munson, who was intoxicated. Munson had an auto insurance policy issued by defendant. The pickup that Munson was driving was owned by Helen Foley, who also had an auto insurance policy issued by defendant. Munson's and Foley's policies each had a $100,000 limit. In a wrongful death action initiated by plaintiff as representative of Marc Goddard's estate against Munson and Foley, defendant defended Munson and Foley. In that case, plaintiff obtained a judgment against Munson in the amount of $863,274 in compensatory and punitive damages. *See generally Goddard v. Munson*, 108 Or App 342, 816 P2d 619, *rev den*, 312 Or 525 (1991) (affirming judgment in wrongful death action). Thus, Munson was subject to a judgment that exceeded available policy limits.[2]

In a separate declaratory judgment proceeding initiated before the wrongful death action had concluded, defendant sued Munson, Foley, Goddard, and Goddard's insurer, State Farm, seeking a declaration that it was not liable under either Munson's or Foley's insurance policies for the accident that killed Marc Goddard. That litigation ultimately resulted in a judgment declaring that Foley's policy provided coverage.[3]

---

[2] The circumstances of the defense of the wrongful death claim are recounted in detail below in our discussion of defendant's compensatory and punitive liability for "bad faith" failure to settle within policy limits. *See* 202 Or App at 85-98.

[3] In that action, the trial court initially concluded in a bench trial that Foley's policy applied but Munson's policy did not. We reversed on the ground that the parties were entitled to a jury determination of certain factual issues. *Farmers Ins. Co. v. Munson*, 127 Or App at 420. After remand, the declaratory judgment action resulted in a jury verdict that both Munson's and Foley's policies covered the accident. In a subsequent appeal, we concluded that there was no coverage under Munson's policy and that defendant was entitled to a directed verdict in that respect, and further concluded that the trial court had erred in excluding certain evidence relevant to whether there was coverage under Foley's policy. *Farmers Ins. Co. v. Munson*, 145 Or App at 530-33. Ultimately, the jury on remand concluded that there was coverage for the accident under Foley's policy. That verdict was not appealed.

In a different declaratory judgment proceeding, Goddard's uninsured motorist insurance carrier, State Farm, sued the Goddard estate, asserting that there was no underinsurance coverage available for the collision. That case was settled. State Farm ultimately paid plaintiff $325,000 under that policy.

In April 1990, after entry of judgment against Munson in the wrongful death action, Munson assigned all of his potential claims against defendant, including potential "bad faith" claims, to plaintiff. In May 1990, plaintiff, as Munson's assignee, filed this action, asserting that defendant had acted in bad faith in defending the wrongful death claim and seeking compensatory damages in the amount awarded to plaintiff against Munson in the wrongful death case, and also seeking $450 million in punitive damages. The trial court initially granted summary judgment to defendant. We reversed on the ground that there was evidence from which a jury could find that plaintiff would have accepted a settlement of the wrongful death action within policy limits had defendant made such an offer. *Goddard v. Farmers Ins. Co.*, 173 Or App 633, 639-40, 22 P3d 1224, *rev den*, 332 Or 631 (2001).[4]

After remand, the jury found that defendant was 80 percent at fault and that Munson was 20 percent at fault. The jury awarded plaintiff compensatory damages of $863,274 and punitive damages of $20,718,576. Before entry of judgment, however, defendant raised several objections, including potential offsets, to the jury's award of compensatory damages. Ultimately, the trial court entered a judgment that provided that plaintiff should recover "$265,619.20 economic damages, plus prejudgment interest thereon in the amount of $343,573.62; and $20,718,576 in punitive damages plus interest thereon at the rate of nine percent per annum," as well as costs and disbursements. An appendix to the judgment set forth the trial court's methodology in calculating the amount of compensatory damages. Because two aspects of that calculation are challenged in assignments of error on plaintiff's cross-appeal, we reproduce that appendix in its entirety:

---

[4] A related opinion pertained to plaintiff's request for attorney fees. *Goddard v. Farmers Ins. Co.*, 177 Or App 621.

| Damages | | | Prejudgment Interest |
|---|---|---|---|
| Economic Damage Verdict | $ 863,274.00 | | |
| Munson's Fault | - 172,654.80 | | |
| Damages as of 2/5/90 | 690,619.20 | | |
| | | $ 131,804.19 | Interest on $690,619.20, 2/5/90-3/20/92 |
| State Farm Payment, 3/20/92 | - 350,000.00 | | |
| Damages as of 3/20/92 | 340,619.20 | | |
| | | + 185,950.08 | Interest on $340,619.20, 3/21/92-4/14/98 |
| Farmers Payment, 4/14/98 | - 100,000.00 | - 75,960.08 | Interest Paid by Farmers, 4/14/98 |
| Returned to State Farm, 4/14/98 | + 25,000.00 | | |
| Damages as of 4/14/98 | 265,619.20 | | |
| | | + 101,779.43 | Interest on $265,619.20, 4/15/98-7/18/02 |
| **Economic Damages** | **$ 265,619.20** | **$ 343,573.62** | **Prejudgment Interest** |

In addition, before entry of judgment, defendant filed a motion for judgment notwithstanding the verdict or in the alternative to order plaintiff to remit a substantial portion of the punitive damage award or to order a new trial, on the ground that the punitive damage award was unconstitutionally excessive. The trial court denied that motion. This appeal and cross-appeal ensued.

Defendant appeals, arguing that the trial court erred in admitting into evidence a pooling agreement between defendant and other related insurance companies and also challenging the amount of the punitive damage award. Plaintiff cross-appeals, arguing that the trial court erred in (1) reducing the compensatory damage amount by $325,000 that State Farm paid to the Goddard estate for underinsured motorist coverage, and (2) allocating defendant's payment in partial satisfaction of the Goddard estate's judgment against Munson to reduce the compensatory damage principal, rather than to reduce the accrued interest on the principal.

## II. FACTS PERTAINING TO COMPENSATORY AND PUNITIVE DAMAGE LIABILITY FOR DEFENDANT'S "BAD FAITH" CLAIMS HANDLING AND FAILURE TO SETTLE

Because the jury found in plaintiff's favor on her "bad faith" claim, we view the evidence pertaining to that claim, and all reasonable derivative inferences, in the light most favorable to plaintiff. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). As noted, the facts at the core of this dispute concern defendant's conduct with respect to the wrongful death action against its insured, Munson. Although normally we summarize the material facts before addressing the law, in this case it is helpful to outline the relevant legal principle underlying plaintiff's claim before turning to the facts.

Under Oregon law, an insurer owes a duty of care to its insured that includes a duty to make reasonable efforts to settle claims in order to avoid exposing the insured to liability in excess of policy limits. *See* ORS 746.230(1)(f) (it is an unfair claims settlement practice if an insurer does not, in good faith, attempt "to promptly and equitably settle claims in which liability has become reasonably clear"); *Maine Bonding v. Centennial Ins. Co.*, 298 Or 514, 518-19, 693 P2d 1296 (1985) ("[T]he insurer must use such care as would have been used by an ordinarily prudent insurer with no policy limit applicable to the claim. The insurer is negligent in failing to settle, where an opportunity to settle exists, if in choosing not to settle it would be taking an unreasonable risk—that is, a risk that would involve chances of unfavorable results out of reasonable proportion to the chances of favorable results.").

The gravamen of plaintiff's claim in this case is that defendant breached that duty owed to Munson by failing to make reasonable efforts to settle the wrongful death action, thus exposing Munson to liability in excess of policy limits. On appeal, defendant acknowledges that, viewing the facts in the light most favorable to plaintiff, as is required after a jury verdict in plaintiff's favor, the evidence demonstrates that

"Farmers ignored settlement demands from plaintiff's lawyers to the detriment of Mr. Munson and concealed or

destroyed witness statements that would have forced it to agree that $100,000 in coverage was available, even as it brought a declaratory judgment action seeking to establish whether there was any coverage. The jury could have believed that Farmers used this case to build a reputation for toughness on claims—that it would not buckle in this case, where liability for its policy limits was clear, in order to be able to settle future cases favorably[.]"

With that law and acknowledgment in mind, we return to the facts.

The fatal accident occurred on October 29, 1987. Munson, who had consumed a large quantity of alcohol, made a left turn into a tavern parking lot and collided with Marc Goddard's oncoming vehicle, killing Goddard. Shortly after the collision, Foley, who was to meet Munson at the tavern, arrived on the scene. Both Munson and Foley told a police officer that Munson had been driving Foley's truck with Foley's permission. Although Munson believed that he was not impaired by alcohol at the time of the collision, his blood alcohol level taken at the hospital was more than twice the legal limit for operating a motor vehicle.

Defendant's agent, Richard Vanek, had sold insurance policies to both Munson and Foley. Before the collision, Foley had confirmed with Vanek that Munson would be covered under her policy when he drove her truck. After the accident, Vanek told Foley that, if Munson had permission to use the truck at the time of the accident, then both her policy and Munson's policy would apply. Vanek subsequently told Ira Feitelson, an attorney retained by Munson, that both the Foley and Munson policies were in force and might "stack," that is, both policy limits might apply to give total coverage of $200,000.

On November 2, 1987, defendant's claims representative Richard Sellers came to Foley's residence to interview Munson, who was staying there while recuperating from the collision. Foley and Munson both confirmed to Sellers that Munson had been using the truck with Foley's permission. Munson acknowledged that he had consumed eight to ten beers before the collision.

On November 5, 1987, Carl Amala wrote to Sellers, stating that he had been retained by Marc Goddard's estate and seeking to discuss liability, property damage, and medical and burial expenses. Sellers spoke with Amala by telephone, indicating that Sellers did not believe Munson was at fault in the collision. By early December, Sellers had verified through the police that Goddard had his headlights on at the time of the collision.

On December 10, 1987, Amala again wrote to Sellers, stating that the physical evidence demonstrated that the collision occurred in Goddard's lane of travel, that Goddard's headlights were on, and that criminal charges against Munson were contemplated. Amala asked for any information that called into question Munson's liability. He also asked for information about what Farmers policies were involved and what their limits were. By December 10, 1987, Sellers had concluded that Munson's liability for the collision was clear. However, neither Sellers nor any other employee of defendant responded to Amala's letter.

On December 16, 1987, Sellers wrote an investigation report for his supervisor, Doug Heatherington, indicating that both Foley's and Munson's policies were potentially involved, that Munson admitted to having consumed nine beers prior to the accident, and that the case "has policy limits potential." The following day, Sellers wrote a claim status report, stating that the Goddard estate "will want policy limits" and that "[w]e have two policies involved with $200,000 exposure. I feel we should let things 'ripen' a bit before making any settlement talk."

On January 5, 1988, Heatherington wrote to Don McClure, the regional claims manager in Portland, noting that both Foley's and Munson's policies were potentially involved but also noting that Munson's policy might not apply if Munson used Foley's vehicle regularly.[5] That letter further stated that Munson admitted having eight to ten beers before the collision; that Marc Goddard had been 19 years old and was single with no children; and that Goddard

---

[5] Munson's policy contained an exclusion for injuries "arising out of the * * * use of any vehicle other than your insured car, which is * * * available for [your] regular use." *Farmers Ins. Co. v. Munson*, 127 Or App at 416.

was believed to have been recently released from jail. The letter concluded that, although ordinarily liability would be clear for making a left turn in front of an oncoming vehicle, Munson had suggested that Goddard might not have had his headlights on. Heatherington requested that a reserve, or settlement value, of $30,000 be established for the case and suggested that police reports, blood alcohol tests, and information on Goddard's headlights be obtained.

On January 12, 1988, Amala again wrote to Sellers, indicating that he had not received a response to his earlier correspondence and seeking a response. Again, defendant provided no response. Around that time, Heatherington was promoted to defendant's Portland office, and Randy Voth replaced him in the Salem office. Sellers provided a status report to Voth on January 22, 1988, indicating that Goddard's vehicle had its lights on and that Munson had simply made a left turn in front of Goddard's vehicle after consuming nine beers. Sellers stated, "I think we should get some offer out on this if possible soon, or perhaps we should answer a lawsuit and find out facts on [Marc Goddard] through discovery process."

Munson was charged with second-degree manslaughter. On March 3, 1988, Amala wrote again to Sellers, noting that he had received no response to his three earlier letters, that the police reports indicated that Munson was at fault in the collision, and that Munson had been charged with manslaughter. He again sought information about the policies involved and asked that defendant respond in writing concerning the settlement of the property damage portion of the case. In late March, Amala spoke on the phone with Sellers, and Sellers confirmed that Foley and Munson each had $100,000 of coverage. Sellers also represented to Munson's attorney, Feitelson, that both Foley's and Munson's policies would apply.

On March 28, 1988, Amala sent a demand letter to Sellers, indicating that he would recommend to his client that she accept $200,000 to settle all claims against Munson, giving a three-week response time. On March 31, 1988, Sellers wrote a claim status report noting the $200,000 demand and requesting authority to settle for up to $50,000.

The report stated that Sellers was awaiting an accident reconstruction report and that Munson's attorney, Feitelson, was trying to obtain information on Marc Goddard's criminal history.

In early April, Sellers received the accident reconstruction report from Wong & Associates, which verified that Munson appeared to have turned in front of Goddard's vehicle, which had been going approximately the speed limit; however, that investigation was unable to determine whether Goddard's headlights had been on. Also in April, Feitelson wrote Sellers to indicate that, at the time of the collision, Goddard had been on probation and a probation revocation hearing had been scheduled.

On April 25, 1988, Voth, Sellers's supervisor in the Salem office, wrote to McClure, in the Portland regional office, indicating that the police were unable to determine whether Goddard's headlights had been on and further indicating that Wong & Associates would attempt to determine whether the headlights had been on. On May 3, 1988, Sellers submitted a status report to Voth, explaining that a state police report concluded that Goddard's headlights had been on and that the present demand was for $200,000. Sellers concluded, "I think the case has a value of $50,000—and feel we should make the offer now." On May 12, 1988, Sellers called Amala, the attorney for Goddard's estate, indicating that he should have an answer within a few days on settlement but that he knew that defendant was "not going to offer policy limits." Amala responded that the Goddard estate intended to file suit shortly.

On May 26, 1988, Voth wrote to McClure, stating that information showed that Munson had not used a turn signal before turning left and that Goddard's headlights were on. Voth further indicated that he believed that Goddard had recently been released from jail and that he had an alcohol problem. Voth stated, "I feel it is time that we make an offer to plaintiff's attorney" and asked for authority in the amount of $50,000. McClure responded to Voth that he "did not feel we have enough information to evaluate our insured's exposure" and instructed Voth to seek out negative information about Goddard.

On June 6, 1988, the Goddard estate filed a wrongful death action against Munson. J.P. Harris, an attorney who worked with Amala, wrote to Sellers informing him that the suit had been filed and offering to settle "in the amount of policy limits which I understand to be a total of $200,000." Harris stated that the settlement offer would be withdrawn in 30 days. Two days later, Harris again wrote to Sellers, stating that, because Munson had been convicted of criminally negligent homicide, defendant was in the position of "having to admit liability in a case that has aggravated liability justifying punitive damages."

On June 14, 1988, defendant retained the Salem law firm of Parks & Bauer to represent Munson in the wrongful death action. Voth's letter retaining that firm described Munson's consumption of alcohol and the fact that Goddard's headlights had been on, but also stated that there was information that Goddard had a criminal record. Voth further noted that plaintiff's demand was for $200,000 under both policies. Voth then wrote to Munson stating that defendant had retained Parks & Bauer "who will enter a defense and protect your interests" in the wrongful death case. That letter acknowledged that "[i]t is possible that a judgment could be secured in excess of the limits of your insurance policy."

Also on June 14, one of Munson's attorneys in the criminal case, James McGehee, wrote to defendant. McGehee noted that the Goddard estate was willing to settle with Munson for policy limits and stated that, given Munson's manifest criminal liability and the potential for a verdict in excess of $200,000, he was reluctant to recommend that Munson go to trial on the wrongful death case. McGehee concluded:

> "This letter is to put you on notice that if this case is not settled for the policy limits on or before the date asked by Mr. Amala, and if a jury verdict is rendered in excess of the $200,000.00 Mr. Munson will be looking directly to you for payment of the overage on the basis of bad faith settlement efforts."

Munson's other criminal defense attorney, Feitelson, believed that the damages in the wrongful death case likely would exceed $200,000.

Defendant did not respond to the Goddard estate's settlement offer. On July 25, 1988, Amala spoke with Keith Bauer, the insurance defense attorney whom defendant had retained to defend Munson in the wrongful death action. Bauer told Amala that he believed that only one policy of $100,000 was available and that the criminal sentencing would reduce any punitive damages. Shortly thereafter, Bauer, who had not yet conferred with Munson, filed an answer in the wrongful death action denying that Munson had been under the influence of intoxicants and that he had caused the collision, but did not assert as a defense that Goddard was negligent in any way in causing the collision.

On July 27, 1988, Feitelson wrote to defendant, stating that neither he nor McGehee had heard back from defendant but that he understood that defendant was taking the position that only one $100,000 policy was involved. Feitelson requested a copy of any coverage opinion to that effect.[6]

On July 29, 1988, defendant retained attorney Lynn Ashcroft to provide a coverage opinion. The letter retaining Ashcroft stated that defendant suspected that Munson had had frequent use of Foley's truck and asked whether, under those circumstances, defendant was exposed to the full $200,000 limits of both policies.

In early August, Billy Sime, an attorney with Parks & Bauer, attended Munson's deposition in the wrongful death action. During the deposition, Munson stated for the first time that Foley had told him not to drive her pickup when he had been drinking and that Foley had picked him up at taverns a number of times when he was too drunk to drive home. Sime then spoke privately with Foley, who told him that Munson "could not even have one drink of alcohol and drive her truck" and that she had taken the truck away from Munson on previous occasions when he had been drinking. Sime subsequently wrote to defendant, stating that, although Munson's and Foley's statements were consistent in that they agreed that Munson was not supposed to drive the

---

[6] Shortly thereafter, plaintiff's attorney, Harris, asked Bauer for a copy of any such opinion letter.

truck when he had been drinking, their interests were potentially adverse because Foley was a potential defendant in the wrongful death action on the theory that she had negligently entrusted the truck to Munson despite her knowledge of his drinking problem.

Shortly thereafter, defendant sent claims representative Mary Kay Hendrickson to interview Foley. Foley told Hendrickson that Munson had used her truck probably 100 times while working for her and that, on several occasions, he had also borrowed her truck when he was getting his car fixed. Foley also stated that she told everybody "no drinking when you're driving my pickup." Foley told Hendrickson that she had never had any reason to believe that Munson had been driving the pickup and drinking. Foley acknowledged, however, that she had planned to meet Munson at the tavern on the evening of the collision and that she knew he would be driving her truck.

In September 1988, because of the potential conflict between Munson and Foley, defendant retained attorney Sandra Haynes to represent Foley in the wrongful death action. In the letter retaining Haynes, Voth noted that the Goddard estate was planning to add Foley as a defendant on the theory that she negligently entrusted her vehicle to Munson. Haynes spoke with Foley, who denied any knowledge of Munson's drinking problem and any knowledge that he had driven her truck while intoxicated. Because Foley's statements were at odds with Munson's deposition testimony that Foley would pick him up at taverns after he had had too much to drink, Haynes believed that one of the two—probably Foley—was lying. Shortly thereafter, an amended complaint was filed in the wrongful death action, naming Foley as a defendant.

On October 14, 1988, Ashcroft wrote to defendant, recommending that it initiate a declaratory judgment action, naming as defendants Munson, Foley, the Goddard estate, and Goddard's underinsurance carrier, State Farm, to obtain a determination of whether there was coverage under either Munson's policy or Foley's policy. Consequently, on October 17, Voth sent Munson a reservation of rights letter, stating

that defendant was investigating whether there was coverage under either policy. In particular, Voth indicated that there were two potential coverage disputes: (1) whether, under Foley's policy, Munson was a covered "permissive user" of Foley's vehicle;[7] and (2) whether Foley's vehicle was covered under Munson's policy because it was not a vehicle that was being temporarily used and, thus, fell within that policy's "regular use" exclusion. *See* 202 Or App at 87 n 5. Shortly thereafter, defendant obtained a coverage opinion from attorney William Hallmark, who concluded that a driver who drove after consuming alcohol contrary to the owner's express instructions was not a "permissive user" of the vehicle as defined in the policy.[8]

In November 1988, Harris, one of the attorneys for the Goddard estate, told Foley's attorney, Haynes, that the Goddard estate would settle with Foley for her policy limits of $100,000, and Haynes sought from defendant the authority to settle the case for that amount. Haynes believed that a $100,000 policy limits settlement was reasonable, and she did not want the case to go to trial because of her concerns about her client's lack of candor.[9] Haynes also recommended that defendant adjust the claims against Foley and Munson separately due to the conflicts of interest.

Heatherington and McClure then sought authority from defendant's home office either to file the declaratory judgment action or to settle for $100,000. In December 1988, Voth received authorization from the home office to file the declaratory judgment action, but settlement authority was limited to $30,000. At about the same time, in a letter to Hallmark, defendant noted that Bauer had estimated the value at "$50,000 to $75,000, with a possible range of $100,000."

---

[7] Foley's policy excluded coverage for "[a]ny person who uses a vehicle without having sufficient reason to believe that the use is with permission of the owner." *Farmers Ins. Co. v. Munson*, 127 Or App at 416.

[8] As noted, 202 Or App at 82 n 3, the jury in the subsequent declaratory judgment litigation ultimately determined that there was, in fact, coverage under Foley's policy.

[9] Evidence presented in this case showed that, in fact, neither Munson nor Foley was being candid at that point about the circumstances under which Munson was permitted to use Foley's vehicle.

On December 21, 1988, Ashcroft filed the declaratory judgment action on defendant's behalf, seeking a declaration that there was no coverage under either policy. Ashcroft noted in a letter to defendant that the existence of the declaratory judgment action did not free defendant from its obligations to act reasonably to negotiate settlement within policy limits, stating that, if the claim could exceed policy limits, "even if coverage is in question, [it may be appropriate] to pay the policy limits into the court to be held pending the outcome of the declaratory relief action." Like Haynes, Ashcroft also advised defendant that the Foley and Munson claim files should be adjusted separately in order to avoid potential conflicts. Voth subsequently assigned the Foley file to David Strand, an adjustor in the Salem office. Nevertheless, Voth apparently continued to have supervisory responsibility for both the Munson and Foley files; in particular, Strand sought and received Voth's approval before authorizing Haynes to make a settlement offer of $30,000 to settle all claims against both Munson *and* Foley. Although Haynes conveyed the offer, she believed that it was unacceptably low and suspected that defendant was not negotiating in good faith. Plaintiff declined that offer.[10]

Defendant did not inform Munson or his attorney, Feitelson, that it had made an offer on his behalf and that the offer had been rejected. In early 1989, Feitelson, on Munson's behalf, wrote Bauer on several occasions seeking information regarding possible settlement and requesting that defendant not expose Munson to liability beyond his insurance limits. Defendant failed to respond.

No further settlement offers or negotiations occurred in 1989, and the various parties prepared to go to trial on both the wrongful death case and the declaratory judgment action. The wrongful death case was scheduled for trial in January 1990. On January 4, 1990, Voth requested that Bauer submit an evaluation of the case so that Voth could request settlement authority. On January 8, 1990, Feitelson

---

[10] Foley briefly retained attorney Charles Wood in conjunction with the declaratory relief action but was unrepresented throughout most of that proceeding. Wood asked Strand why defendant had not offered policy limits, given that the value of the case easily exceeded $100,000.

again wrote to Bauer on Munson's behalf, stating that he was "unaware of any good faith attempts to negotiate or settle this case" and asking that defendant make such an attempt. Feitelson warned that, if no settlement attempts were made and judgment exceeded policy limits, Munson would bring a bad faith claim against defendant.

On January 11, 1990, Bauer's firm wrote and had hand-delivered to defendant an evaluation that concluded that "the case has a reasonable jury value between $75,000 and $150,000 for non-economic damages plus punitive damages." Later that day, however, Bauer had his staff retrieve that letter from defendant's office and replace it with a letter, also dated January 11, that deleted the amounts $75,000 and $150,000 and substituted a much lower range of exposure—$35,000 to $60,000—for noneconomic damages. Because of Goddard's criminal record, Bauer did not believe that a jury would award economic damages.

The wrongful death case was tried from January 16 through January 24, 1990. On the first day of trial, Bauer offered $30,000 to settle the case, and the offer was rejected. At the end of the first day of trial, Bauer increased the offer to $50,000, with the option to arbitrate any additional damages up to the policy limits established in the declaratory judgment action. The Goddard estate countered that it would accept $100,000 with an additional $100,000 to be paid only if the declaratory judgment action established that both policies applied. Bauer responded that defendant would not agree to such a settlement. At that point, Voth was of the opinion that Munson's exposure was between $60,000 and $150,000 "and maybe more."

On the third day of trial, Bauer offered $100,000, with the understanding that, if the declaratory judgment action determined that both policies applied, arbitration would need to occur to establish the amount between $100,000 and $200,000 that defendant would pay. That is, in contrast to the estate's counteroffer under which the estate would automatically recover the additional $100,000 if the arbitrator determined that both policies applied, under defendant's final offer any payment in excess of $100,000

would be further conditioned upon the arbitrator's determining that the estate was, in fact, entitled to recover wrongful death-related damages in that amount. The Goddard estate rejected that final offer.

On January 23, 1990, the case was submitted to the jury. Bauer's trial notes indicate that, on that day, the trial court's judicial assistant, Patti Frye, told Bauer that he should settle the case because the jury was "talking big dollars."[11] Bauer relayed that information to Voth, who relayed it to Heatherington and McClure. McClure decided not to increase the settlement offer. Bauer did not inform either the court or opposing counsel of Frye's remarks.

On January 24, 1990, the jury returned a verdict against Munson for $188,274 in economic damages, $425,000 in noneconomic damages, and $250,000 in punitive damages—a total of $863,274. As noted above, defendant appealed the verdict on Munson's behalf, and we affirmed. *Goddard*, 108 Or App at 347.

In the present bad faith case, plaintiff presented expert testimony assessing the tactics pursued by defendant in dealing with the Goddard claim. James Nelson, an attorney with extensive experience in insurance cases, testified that insurance companies sometimes engage in the practice of "stonewalling," which involves refusing to negotiate settlement because claimants often have very limited resources and mounting medical and legal bills; "stonewalling" puts psychological and financial pressure on such claimants to accept settlements that are less than reasonable. Nelson further testified that another negotiation strategy, "lowballing," involves making minimal settlement offers to signal that the insurance company is willing to fight the claim and

---

[11] Defendant asks this court to take judicial notice of the contents of the affidavit of that judicial assistant, apparently submitted in a proceeding before the Oregon State Bar, denying that she had revealed jury deliberations to Bauer. We cannot do so. First, OEC 201(b) allows us to take judicial notice of facts "not subject to reasonable dispute." Had defendant wished to dispute plaintiff's evidence that Frye provided Bauer with the information in question, it had an opportunity to do so at trial, but did not. Because the issue is in dispute, we cannot take judicial notice of the affidavit. Moreover, even if the affidavit were subject to judicial notice, it would merely be evidence that the affidavit existed; judicial notice does not mean that we are able "to consider as evidence the contents of that document." *Frady v. Frady*, 185 Or App 245, 248, 58 P3d 849 (2002).

to lower the claimant's expectations. In Nelson's opinion, defendant had used both strategies in handling the Goddard claim. According to Nelson, the $30,000 offer was a "low-ball" offer because the Goddard claim should, reasonably, have been valued at over $200,000.

Plaintiff also presented expert testimony from John Partlow, who rendered an opinion as to whether the claim against Munson was handled properly. Partlow had worked as a claims auditor for a large insurance company. In that position, he examined claims files to determine if the claims had been handled properly, and he subsequently performed similar functions as a consultant. Partlow testified that coverage limits should be communicated promptly and that mistakes about coverage limits should be disclosed promptly. He further testified that defendant's failure to respond to the time-limited settlement demand violated the company's own policies and did not comport with industry standards. Partlow concluded that defendant had failed to make a timely and sufficient investigation of the collision and had failed to negotiate fairly throughout its handling of the Goddard claim—and, indeed, that, in his 15 years of evaluating claims, the handling of the Goddard claim was among the worst he had ever seen.

Plaintiff also presented expert testimony from Jeffrey Jacobs, an attorney who had significant experience working as in-house counsel in Oregon for an insurance company. Jacobs testified that defendant's conduct in failing to respond to communications from the attorneys for the Goddard estate for many months after the collision fell below the industry standard of care. He further testified that a decision to let the claim "ripen" rather than respond to an attorney under these circumstances very seriously jeopardizes the protection of the person who has paid the insurance premiums.[12] In Jacobs's view, liability and the value of the case as in excess of policy limits was clear by June 1988, when defendant failed to respond to the time-limited demand that was made by the Goddard estate, and failing to respond was not in keeping with industry standards. According to Jacobs, the

---

[12] Another expert explained how delay in payment of insurance claims increases the insurer's profits.

case should have been valued in the range of $500,000 to $750,000.

Plaintiff also presented evidence of defendant's use of "low-balling" tactics in another case involving a collision where an injury resulted from the conduct of a drunk driver insured by defendant. In that case, in which Bauer also represented the insured, the injured party accepted an offer of less than policy limits due to financial pressures, even though his attorney believed the case to be worth more than policy limits. That attorney testified that Bauer had told him, "Voth doesn't pay policy limits."

One final aspect of plaintiff's proof is pertinent to the issues presented on appeal: Plaintiff presented evidence concerning defendant's organizational structure and financial condition. The named defendant, Farmers Insurance of Oregon, is essentially a paper company with no employees that contracts out its functions to other Farmers-related entities. It is a part of the larger Farmers Insurance Group of Companies. As addressed more fully in our discussion of defendant's first assignment of error, Farmers Insurance of Oregon is a party to a "pooling agreement" executed by eight Farmers-related insurance companies.[13] That agreement generally provides that (1) all of the parties to the agreement market their products using the same agents, jointly own claims offices, and conduct their claims service on a joint basis; and (2) to reduce their need for reinsurance, the parties will pool their losses, their premiums, and their surpluses pursuant to an agreed allocation. The agreement covers not only payment of claims under policies but also extracontractual obligations such as the type of loss incurred as a result of liability on a "bad faith" claim. Under the "pooling agreement" in effect at the time of the Goddard claim, Farmers Insurance of Oregon's share of the pool was 4.28 percent of the total.

---

[13] In fact, three of the other parties to the agreement, Farmers Insurance Exchange, Truck Insurance Exchange, and Fire Insurance Exchange, together own 100 percent of the stock of Farmers Insurance of Oregon.

## III.  ANALYSIS

On appeal, defendant raises two contentions. First, defendant asserts that the trial court erred in admitting into evidence the "pooling agreement" and that that error requires a new trial as to both compensatory and punitive damage liability. Second, defendant contends that the trial court erred in failing to order plaintiff to remit the punitive damages to a much smaller amount or, alternatively, in failing to order a new trial, on the ground that the punitive damage award was unconstitutionally excessive under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

On cross-appeal, plaintiff raises two assignments of error, both of which relate to the trial court's method of calculating the compensatory damages award. *See* 202 Or App at 84 (reproducing trial court's calculation). First, plaintiff contends that the trial court erred in reducing the compensatory damages by the amount that State Farm paid to the Goddard estate for the underinsured motorist coverage. Second, plaintiff asserts that the court erred in allocating $100,000 of defendant's payment under Foley's policy in 1998 to reduce the principal rather than to reduce the accrued interest on the underlying judgment.

For the sake of cogency, we address the parties' challenges in the following order: First, we address the evidentiary question concerning the "pooling agreement," because resolution of that question in defendant's favor would necessitate a new trial, obviating the need to address questions concerning damages. Second, we address plaintiff's two assignments of error on cross-appeal because their disposition will fix the correct amount of compensatory damages on the bad faith claim—which, in turn, is a necessary predicate for a reasoned assessment of defendant's "excessiveness" challenge to the punitive damage award. Finally, and consequently, we address the constitutionality of the punitive damage award.

A. *Admissibility of the "Pooling Agreement"*

In the trial court, plaintiff argued that the "pooling agreement" was relevant because, given defendant's relatively small share of the pooled risk and consequent limited exposure even in the event of a successful bad faith claim, a jury could infer that defendant lacked an incentive to deal fairly with the Goddard claim and to avoid an excess liability verdict against Munson. Defendant objected under OEC 411(1), arguing that the "pooling agreement" was inadmissible "evidence that a person was * * * insured against liability." OEC 411 provides:

> "(1)   Except where lack of liability insurance is an element of an offense, evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully.

> "(2)   Subsection (1) of this section does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proving agency, ownership or control, or bias, prejudice or motive of a witness."

The trial court rejected that argument, admitted the agreement for the reasons advanced by plaintiff, and further suggested that the "pooling agreement" was also relevant to punitive damages.

■      On appeal, defendant argues that OEC 411(1) bars admission of the pooling agreement, because it is evidence that defendant was "insured against liability[.]" As explained below, we disagree.

The parties' arguments are relatively straightforward. As noted, defendant contends that the "pooling agreement" is evidence that it was insured against liability and was offered to prove that it acted wrongfully. Plaintiff responds that the "pooling agreement" is not evidence that defendant was insured against liability and that, even if the agreement otherwise fell within the scope of OEC 411(1), it could nevertheless have been admitted under OEC 411(2) as evidence of defendant's motive. We need not determine

whether the "pooling agreement" would have been admissible evidence of "motive" under the exception found in subsection (2), because we conclude that the trial court correctly determined that it was not evidence that defendant was "insured against liability" and, thus, was not subject to exclusion under subsection (1).

At the outset, we emphasize the narrowness of our inquiry. We are not called upon to assess the general relevance of the "pooling agreement" to any issue in the case or to determine whether that agreement should have been excluded, on balance, under OEC 403. Rather, the sole issue, as framed by defendant's assignment of error, is whether the pooling agreement is inadmissible under OEC 411(1) because it is evidence that defendant was "insured against liability."

Neither the term "liability insurance" nor the phrase "insured against liability" is defined for purposes of OEC 411. However, both are relatively common phrases that are susceptible to straightforward definition. "Liability insurance" is "insurance against loss resulting from liability for injury or damage to the persons or property of others," *Webster's Third New Int'l Dictionary* 1302 (unabridged ed 2002). *See also Black's Law Dictionary* 817 (8th ed 2004) (defining "liability insurance" as "[a]n agreement to cover a loss resulting from the insured's liability to a third party, such as a loss incurred by a driver who injures a pedestrian"). "Insure" means:

> "**2 :** to assure against a loss by a contingent event on certain stipulated conditions or at a given rate or premium : give, take, or procure an insurance on or for : enter into or carry a contract of insurance on—used of either the person who pays the insurance premiums or the society, corporation, or underwriter that undertakes the risk as subject and of the thing to which the risk attaches (as life or property) or the sum secured as object **3 :** ensure ~ *vi* : to contract to give insurance : underwrite : *also* : to procure or effect insurance[.]"

*Webster's* at 1173; *see also Black's* at 822-23 ("Insure" is "[t]o secure, by payment of a premium, the payment of a sum of

money in the event of a loss" or "[t]o issue or procure an insurance policy on or for (someone or something)."").[14] Finally, "liability," in common usage, means "[t]he quality or state of being legally obligated or accountable[.]" *Id.* at 932.

The foregoing definitions suggest that a "pooling agreement," by which multiple insurers share revenues and risks, is not a form of "liability insurance" in its ordinarily understood sense. To be sure, one feature of an insurance "pooling agreement" serves as the functional equivalent of a form of partial reinsurance; here, for example, defendant is ultimately obligated to pay 4.8 percent of covered losses by its own insureds, with the other insurer members of the pool assuming the remaining 95.2 percent of such losses. But the "pooling agreement" does much more. *See Black's* at 822 (defining "insurance pool" as "[a] group of several insurers that, to spread the risk, combine and share premiums and losses"). The pooling arrangement functions as a device for sharing many types of losses, as well as surpluses, among the participating Farmers companies. For example, and most obviously, defendant is obligated to pay 4.8 percent not only of its own losses, but also of the losses of other pool members. "Liability insurance," as defined above, contains no such feature.

There is no suggestion in the statutory context that the legislature, in enacting OEC 411, intended the terms "liability insurance" and "insured against liability" to have anything other than their common meaning. A review of the multitude of Oregon statutes that refer to "liability insurance" yields several (perhaps unremarkable) conclusions: (1) The legislature, when it refers to "liability insurance," is referring to a contractual agreement by which one party, in return for payment of premiums that are generally based on an actuarial assessment of risk, agrees to indemnify a second party for damages that third persons suffer as a result of the second party's conduct. *See, e.g.,* ORS 31.355; ORS 465.475; ORS 806.080. (2) The legislature does not use the terms "liability

---

[14] The noun "insured" is defined as "a person whose life, physical well-being, or property is the subject of insurance : the owner of a policy of insurance : policyholder," *Webster's* at 1173, or "[a] person who is covered or protected by an insurance policy." *Black's* at 823. However, the word "insured" is used as a verb rather than a noun in OEC 411, so those definitions are not of direct assistance here.

insurance," "reinsurance," and "self insurance" interchangeably; rather, the legislature's differentiation among those terms in various insurance-related contexts demonstrates the legislature's awareness, and intent, that those terms connote different concepts and practical arrangements. *See, e.g.,* ORS 30.282; ORS 332.435; ORS 731.126; ORS 735.605; ORS 806.060. (3) The legislature has enacted no statutes that style pooling agreements among insurance companies as a species of "liability insurance."[15]

In sum, given the plain meaning of the terms "liability insurance" and "insured against liability" and the pertinent statutory context, it is apparent that the legislature, in enacting OEC 411(1), did not intend that provision to encompass and compel the exclusion from evidence of insurance "pooling agreements." Accordingly, the trial court did not err in admitting the pooling agreement.

B. *The Cross-Appeal: Calculation of Compensatory Damages for Bad Faith*

■      We proceed, then, to plaintiff's two assignments of error on cross-appeal concerning the trial court's calculation of the compensatory damage award. Plaintiff first contends that the trial court erred in reducing the compensatory damage award by the $325,000 that plaintiff's underinsured motorist (UIM) coverage carrier, State Farm, paid to plaintiff in 1992 following the affirmance of the wrongful death action. *See* 202 Or App at 84 (setting out trial court's calculations). In effecting that reduction, the trial court agreed with defendant that the "collateral source rule"—by which "a defendant cannot escape [its] liability because the injured party is made whole by its own efforts or the efforts of others," *McKee Electric Co. v. Carson Oil Co.*, 70 Or App 1, 8, 688 P2d 1360 (1984), *aff'd*, 301 Or 339, 723 P2d 288 (1986)—did not apply to the circumstances here. In particular, defendant argued, and the trial court agreed, that the collateral source rule was inapposite where (1) a plaintiff obtains an excess verdict in

---

[15] Nor have we found case law from any jurisdiction (many of which have similar evidentiary limitations on admission of evidence of liability insurance) that indicates that an insurance "pooling agreement" is a species of "liability insurance."

underlying tort litigation; (2) the defendant in the tort litigation subsequently assigns his or her bad faith claim to the plaintiff; and (3) before the bad faith claim is finally adjudicated, the plaintiff receives payments from a third party that compensate some or all of the loss that was the object of the original excess verdict. For the reasons that follow, we conclude that the trial court erred.

ORS 31.580, which codifies the collateral source rule, provides:

> "(1)  In a civil action, when a party is awarded damages for bodily injury or death of a person which are to be paid by another party to the action, and the party awarded damages or person injured or deceased received benefits for the injury or death other than from the party who is to pay the damages, the court may deduct from the amount of damages awarded, before the entry of a judgment, the total amount of those collateral benefits other than:
>
> "(a)  Benefits which the party awarded damages, the person injured or that person's estate is obligated to repay;
>
> "(b)  Life insurance or other death benefits;
>
> "(c)  Insurance benefits for which the person injured or deceased or members of that person's family paid premiums; and
>
> "(d)  Retirement, disability and pension plan benefits, and federal Social Security benefits."[16]

Defendant asserts that the present (bad faith) case does not involve an award of "damages for bodily injury or death of a person"—and, thus, ORS 31.580(1)(c) does not apply here. That is true. But, as plaintiff points out, the fact that ORS 31.580 does not speak to the proper treatment in bad faith litigation of the plaintiff assignee's receipt of collateral benefits with respect to the underlying excess judgment does not necessarily permit, much less require, that compensatory damages in the bad faith case be reduced by the amount of those payments. That is so because, at least in the abstract, the injury in the underlying tort case (Marc Goddard's death) and the injury in the bad faith case

---

[16] At the time of trial, before 2003, ORS 31.580 was codified as ORS 18.580. *See* Or Laws 2003, ch 576, § 232.

(Munson's exposure to a verdict in excess of policy limits) are distinct. Consequently, there is no potential here for multiple recoveries of damages for the same injury.

Plaintiff's argument against the $325,000 reduction rests, as we understand it, on two premises. First, plaintiff would have been entitled to recover the full amount of the underlying wrongful death judgment, $863,274, against Munson, regardless of the UIM carrier's payment. *See* ORS 31.580(1)(c). That is, given the proper operation of the collateral source rule in the context of the underlying tort litigation, Munson's "excess verdict" exposure was fixed and unaffected. Second, for purposes of the bad faith litigation, plaintiff, as Munson's assignee, was, in effect, Munson. Thus, just as Munson could have recovered compensatory damages on the bad faith claim to the full extent of his excess verdict exposure (unaffected by plaintiff's receipt of collateral benefits in the wrongful death action), so too can plaintiff.

We do not understand defendant to dispute either of those premises as an *abstract* proposition. However, defendant contends that, in the concrete circumstances presented here, neither is valid. In particular, defendant contends that, given language in the assignment agreement between plaintiff and Munson, Munson's potential liability to plaintiff was, in fact, necessarily reduced to the extent of plaintiff's receipt of UIM benefits—and that, in turn, necessarily and concomitantly reduced defendant's "bad faith" liability to Munson (and to plaintiff as Munson's assignee). For the reasons that follow, we reject that argument.

Under the assignment agreement, Munson assigned to plaintiff the right to recovery of any claims he might have against defendant or any other entity having any responsibility for the judgment entered against Munson in *Goddard v. Munson*. The agreement further provided that, "in consideration for [that] assignment," plaintiff agreed to:

> "[F]orebear any collection efforts against [Munson] until any and all claims against any and all sources of insurance proceeds have been fully exhausted through all reasonable efforts on the part of [plaintiff]. Such actions include, but are not limited to the following:

"A. The Declaratory Judgment action now pending in Case No. 88C-11994 referenced above;

"B. Any and all uninsured/underinsured motorist claims against State Farm Insurance Company;

"C. Any and all claims, whether characterized as 'bad faith', or otherwise, against Farmers Insurance Company of Oregon for their handling of the underlying Case No. 88C-10733 referenced above."

In addition, the agreement recited:

"It is not the intent of the parties, through this assignment, to extinguish any claims which [Munson] may have against Farmers Insurance Company of Oregon, or any other insurance carrier. This assignment therefore does not release [Munson] from the Judgment entered above, nor should it be construed to in any way to affect any obligation of indemnity on the part of any insurance company which may have coverage for [Munson]."

Defendant contends that, pursuant to the foregoing language, plaintiff agreed to set off any insurance proceeds, including her recovery from State Farm, against Munson's liability to her under the judgment. Plaintiff responds that defendant misreads the assignment, noting that it further provides that "this assignment does not release [Munson] from his legal obligation to pay any unsatisfied portion of the judgment rendered in [*Goddard v. Munson*]."

We agree with plaintiff that the offset was inappropriate. As plaintiff correctly notes, the assignment does not set off insurance proceeds against Munson's wrongful death liability. Rather, it provides that plaintiff will "forebear any collection efforts" until plaintiff has exhausted all avenues of insurance coverage. Moreover, the limiting language quoted above makes it clear that it was not the intent of the parties to that agreement that defendant's liability be reduced in the manner suggested by defendant. *See Collins v. Fitzwater*, 277 Or 401, 560 P2d 1074 (1977).

In *Collins*, the court addressed a similar issue. There, a corporate director, Parker, and a corporate attorney, Fitzwater, were jointly and severally liable to certain individuals for unregistered sales of securities in the amount of

approximately $60,000. Parker assigned all causes of action he had against Fitzwater to the judgment creditors. *Id.* at 403-04. The assignee-judgment creditors prevailed in their action against Fitzwater, who, on appeal, argued that he was not liable because Parker was not liable. *Id.* at 410. The court rejected that argument:

> "Parker was legally liable on the outstanding judgments. He also had a valuable cause of action against the defendant for the full amount of those judgments. In exchange for the covenants not to execute, Parker assigned his claim against the defendant to plaintiffs. At the time of the assignment, Parker had not yet been relieved of his liability, and, in our view, plaintiffs received from him exactly what they bargained for: Parker's unimpaired cause of action against the defendant for the full value of the outstanding judgments."

*Id.* at 411; *see also Groce v. Fidelity General Insurance*, 252 Or 296, 310, 448 P2d 554 (1968) (rejecting similar argument and noting that the effect of accepting the defendant's argument "would be to defeat the purpose of these assignments").

In *Lancaster v. Royal Ins. Co. of America*, 302 Or 62, 726 P2d 371 (1986), the court disavowed one aspect of its reasoning in *Collins*—it explained that "[w]hether the assignment was made of a judgment in existence or a judgment to come into existence is not determinative of whether or not the insured's assignee may maintain an action against the insurance company. Rather, the language of the covenant is determinative." 302 Or at 67. Here, the language of the assignment agreement *is* determinative—it did not relieve Munson of his liability toward plaintiff and, consequently, did not entitle defendant to any offset. We thus conclude that the trial court erred in offsetting plaintiff's receipt of UIM proceeds from State Farm against defendant's liability for acting in bad faith toward its insured, Munson.

■ Plaintiff's second assignment of error on cross-appeal challenges the trial court's application of part of the amount that defendant ultimately paid out under the Foley policy in 1998, *see* 202 Or App at 84, to reduce the *principal balance* rather than the interest that had accrued on the principal

balance at the time the payment was made. Plaintiff maintains that, under what is known as "the United States Rule," when a partial payment has been made, the court "is to apply the payment, in the first place, to the discharge of the interest then due." *Ainslie v. Spolyar*, 144 Or App 134, 146, 926 P2d 822 (1996), *quoting Connecticut v. Jackson*, 1 Johns Ch (NY) 13, 17-18 (1814). The court in *Ainslie* noted that the United States Rule "applies to calculating interest under ORS 82.010[.]" *Ainslie*, 144 Or App at 146. ORS 82.010 concerns interest on judgments and provides, in general, that simple interest on a judgment accrues from the date of that judgment. Thus, plaintiff contends that, given that simple interest accrued on the wrongful death judgment entered in 1990 under ORS 82.010, any payment in partial satisfaction of amounts owing under that judgment should have been applied first to accrued interest.

Defendant offers two responses. First, defendant contends that our statement in *Ainslie* regarding the applicability of the United States Rule to ORS 82.010 was *dictum* and implies, at least, that we should disavow it. Second, defendant argues that, in all events, the court here *did* follow the United States Rule, because the payment in question consisted of $100,000 under Foley's policy, plus interest on that $100,000 in the amount of $75,960.08,[17] and the trial court applied the $75,960.08 against accrued interest, crediting only the $100,000 against the principal.

We reject, at the outset, defendant's invitation to jettison *Ainslie*'s discussion of the United States Rule. Defendant may well be correct that that discussion was *dictum*; that discussion arguably was not essential to our holding, and we are unaware of any case antedating *Ainslie* that specifically links the United States Rule to calculation of interest under ORS 82.010. Nonetheless, we adhere to that aspect of *Ainslie*: The United States Rule *does* apply to calculating interest because every Oregon decision that we have found concerning the subject holds that Oregon follows the common-law United States Rule, and no statutes have abrogated that rule.

---

[17] Because defendant did not pay out under that policy until 1998, a significant amount of interest was owing.

In *First Nat. Bank v. Courtright*, 82 Or 490, 158 P 277, *on reh'g*, 161 P 966 (1916), the court first addressed the proper way to compute interest where partial payments had been made. The court rejected application of the "mercantile rule," followed by a few jurisdictions, in favor of the "United States rule," which, it noted, "has been adopted by most of the courts in this country[.]" *Id.* at 499. The court (as we did in *Ainslie*) adopted the formulation set forth in *Connecticut v. Jackson, viz.*, that the partial payment is to be applied "in the first place, to the discharge of the interest then due." *First Nat. Bank*, 82 Or at 499 (internal quotation marks omitted).

In *Gayer and Gayer*, 326 Or 436, 446, 952 P2d 1030 (1998), the court again subscribed to that rule, reasoning that "[t]he trial court correctly applied the payments in excess of the monthly [support] obligations first to accrued interest on the oldest judgments, and then to principal" (citing *First Nat. Bank*, 82 Or at 498-99). *See also Magee v. All Terrain Contractors, Inc.*, 144 Or App 279, 285, 926 P2d 323 (1996) (applying the United States Rule in the context of a secured transaction governed by ORS 79.5040 and noting that, although it is an Oregon common-law rule, nothing in the text, context, case law, or legislative history of ORS 79.5040 indicated that the legislature intended to abrogate that rule).

In sum, Oregon courts, when confronted with similar circumstances, have consistently applied the common-law United States Rule. Although the legislature could, of course, elect to abrogate that rule generally, or particularly with regard to ORS 82.010, it has not done so.

Further, and contrary to defendant's alternative assertion, the court here did not, in fact, apply the 1998 payment in accordance with the United States Rule. As noted, under that rule, when partial payment has been made, that payment must be applied first against accrued interest and can be applied against principal only if accrued interest is fully paid down. The United States Rules does not permit the court to apply part of the partial payment (regardless of how described or "apportioned" by the obligor) to incompletely satisfied accrued interest and the balance of the partial payment against principal. At the point that defendant made the partial payment of $175,960.08 in 1998, well over that amount

was due in accrued simple interest on the wrongful death judgment. Thus, none of that payment was properly used to reduce the principal amount owing.[18]

We leave the precise calculation of compensatory damages in accordance with our disposition of the two assignments of error on cross-appeal to the trial court on remand. Nevertheless, we need, at least, a "ballpark figure" for compensatory damages in order to engage in a reasoned review of the punitive damage award, particularly with respect to gauging the ratio between compensatory and punitive damages. For those purposes, we estimate the amount of plaintiff's compensatory loss as follows: The judgment against Munson was entered in early February 1990. As the trial court's chart set forth above reflects, the jury held defendant responsible for 80 percent of the amount awarded, or $690,619.20. Defendant made a partial payment of $175,960.08 approximately eight years later, at which time the simple interest on the portion of the Munson judgment for which defendant was responsible was almost half a million dollars,[19] far in excess of the partial payment, none of which is therefore applicable to the principal. The judgment in the present case was, by stipulation, deemed entered on May 29, 2002, nearly 12 years and 4 months after the 1990 judgment against Munson. We therefore calculate simple interest at 9 percent per annum on $690.619.20 for 12 and one-third years, and conclude that approximately $765,000 in interest was owing. We subtract from that amount the $175,960.08 partial payment, for an interest balance of roughly $589,000. When added to the principal of $690,619.20, the total economic damages should have been approximately $1,280,000.

---

[18] We note that this issue is present in the case only because plaintiff pleaded, and the jury awarded, the full amount of the wrongful death judgment ($863,274) as compensatory damages in the bad faith case. Had defendant successfully argued that the proper measure of damages in this case was the *excess* amount, *i.e.*, the amount of the wrongful death judgment that exceeded the applicable coverage limits ($763,274), then both the amount owed under the policy, as well as the ultimate payment of that amount including accrued interest, would not have had to be a part of the calculus in this case at all.

[19] Simple interest at 9 percent on that amount is approximately $62,000 per annum.

In summary, the compensatory damages in the bad faith case were approximately $1,280,000. The jury assessed punitive damages of $20,718,576. Thus, the ratio of the punitive damages the jury awarded to the amount of compensatory damages plaintiff should have been awarded is slightly greater than 16:1. With that ratio roughly fixed, we turn to defendant's final assignment of error, which challenges the punitive damage award as so excessive as to violate due process.

## C. *Constitutionality of the Punitive Damage Award*

Defendant argues as an initial matter that the United States Supreme Court's decisions in *State Farm Mut. Ins.* and *Cooper Ind. v. Leatherman Tool Grp.*, 532 US 424, 121 S Ct 1678, 149 L Ed 2d 674 (2001), have abrogated the "rational juror" standard of review for punitive damages awards announced by the Oregon Supreme Court in *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8 (1995), *cert den*, 517 US 1219 (1996).[20] We adhered to that standard in *Waddill v. Anchor Hocking, Inc.*, 190 Or App 172, 180-81, 78 P3d 570 (2003) (*Waddill IV*),[21] and decline to revisit the issue here. *See also Bocci v. Key Pharmaceuticals, Inc.*, 178 Or App 42,

---

[20] Defendant presumably also must mean that the standard of review for punitive damages awards set forth in ORS 31.730(2), formerly codified at ORS 18.537(2), is unconstitutional, as that also provides that "the court shall review the award to determine whether the award is within the range of damages that a rational juror would be entitled to award based on the record as a whole, viewing the statutory and common-law factors that allow an award of punitive damages for the specific type of claim at issue in the proceeding."

[21] The *Waddill* litigation, like this litigation, had a convoluted history. In that case, the plaintiff obtained a judgment, including an award of $1,000,000 in punitive damages, against the defendant manufacturer. We initially reversed and remanded for a new trial because an improper specification of negligence had been submitted to the jury. 149 Or App 464, 944 P2d 957 (1997) (*Waddill I*). The Oregon Supreme Court then reversed our decision and remanded to us for reconsideration of issues that we had not reached in our original opinion. 330 Or 376, 8 P3d 200 (2000), *on recons*, 331 Or 595, 18 P3d 1096 (2001) (*Waddill II*). On remand, we affirmed the trial court's judgment, including the full award of punitive damages. 175 Or App 294, 27 P3d 1092 (2001), *rev den*, 334 Or 260 (2002) (*Waddill III*). The United States Supreme Court subsequently granted the defendant's petition for *certiorari* and, following its decision in *State Farm Mut. Ins.*, vacated our decision in *Waddill III* and remanded for reconsideration. *Anchor Hocking, Inc. v. Waddill*, 538 US 974, 123 S Ct 1781, 155 L Ed 2d 662 (2003). Finally, in *Waddill IV*, we determined that, under the methodology prescribed in *State Farm*, the maximum constitutionally permissible award of punitive damages was $403,416, representing four times the award of compensatory damages. 190 Or App at 180-84.

50, 35 P3d 1106 (2001), *vac'd and rem'd on other grounds*, 538 US 974, 123 S Ct 1781, 155 L Ed 2d 662 (2003) (rejecting argument that *Cooper Ind.* requires courts reviewing punitive damage awards to revisit underlying factual findings of juries).

■　It is useful, however, before reviewing the alleged excessiveness of the punitive damage award here, to amplify the application of the "rational juror" standard in accordance with United States Supreme Court precedent. As in *Waddill IV*, we adhere to the following methodology of review: *First*, we review the record pertaining to the "historical facts" of the defendant's conduct—*viz.*, what the defendant did, to whom, how often, and with what knowledge or motivation—under the "any evidence" standard of Article VII (Amended), section 3, of the Oregon Constitution. That is, we view the evidence regarding those matters in the light most favorable to the plaintiff who obtained the punitive damage verdict. *Second*, after having so fixed the *factual* predicate for any award of punitive damages, we then proceed to determine whether, as a matter of law, the award of punitive damages comports with due process. That is, we apply the constitutionally prescribed "guideposts," as delineated in *State Farm Mut. Ins.* and antecedent Supreme Court authority, to the predicate historical facts to determine the maximum constitutionally permissible award of punitive damages.

Our preceding, and protracted, statement of facts, 202 Or App at 85-98, describes the predicate historical facts regarding defendant's conduct toward Munson, its insured, in a manner consistent with our review under Article VII (Amended), section 3.[22] Given the evidence, a rational juror could find the following facts: (1) Defendant, in calculated fashion, engaged in a protracted course of conduct—from its initial "stonewalling" and "low-balling" tactics through its fraudulent manipulation of the claims evaluation process and its refusal to settle even at trial—that exposed its

---

[22] The focus of an award of punitive damages on the bad faith claim is, necessarily, on defendant's conduct *vis-à-vis* its insured, Munson, and not, except collaterally, on defendant's conduct towards plaintiff in the context of the wrongful death action.

insured to the virtual certainty of a devastating excess verdict in a "no defense" case. (2) Defendant willfully engaged in such conduct, heedless of its insured's interests and in cynical violation of its obligations to its insured, for its own selfish purposes of building and maintaining a reputation for "toughness" in claims adjustment and settlement. (3) Defendant's conduct towards Munson was intentional, deceitful, and malicious. (4) Defendant's hardball tactics in this case were typical, not merely an isolated instance: "Voth doesn't pay policy limits."

With the factual predicates for punitive damages so understood, we turn to the "guideposts" and, particularly, the Court's most recent pronouncement, *State Farm Mut. Ins.* That case is particularly pertinent because *State Farm Mut. Ins.*, like this case, involved an insurer's bad faith failure to settle a claim within policy limits, which resulted in an excess third-party liability verdict. For that reason, we examine *State Farm Mut. Ins.* in considerable detail.

State Farm issued an automobile liability insurance policy to the plaintiff, Campbell. In 1981, Campbell caused a collision that resulted in the death of one driver and the permanent disability of another driver. Campbell was not injured. 538 US at 413. Campbell's insurance policy limits were $25,000 per claimant. The disabled driver and the estate of the driver who was killed each offered to settle for policy limits. State Farm refused to settle, and the case went to trial. *Id.* The jury found Campbell to be 100 percent at fault and returned a verdict of $185,849. *Id.*

Campbell then filed a bad faith claim against State Farm. Campbell presented evidence that State Farm's decision to take the case to trial " 'was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide.' " *Id.* at 415 (quoting *Campbell v. State Farm*, 65 P3d 1134, 1143 (Utah 2001)). The jury awarded $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million in compensatory damages and $25 million in punitive damages. *Id.* The Utah Supreme Court reinstated the jury's verdict, relying in part on the reprehensibility of State Farm's conduct, as demonstrated by its nationwide policy to reduce

payouts on claims, and on evidence of State Farm's wealth. *State Farm Mut. Ins.*, 538 US at 415-16.

The United States Supreme Court reversed and remanded. *Id.* at 429. The Court began by noting that the Due Process Clause of the Fourteenth Amendment "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* at 416. The Court then reiterated the three "guideposts" that it had earlier enunciated in *BMW of North America, Inc. v. Gore,* 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996), for use in evaluating punitive damage awards:

> "(1) the degree of reprehensibility of the defendant's mis-conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."

*State Farm Mut. Ins.*, 538 US at 418.

In assessing the evidence relevant to the first guide-post, courts are to consider whether

> "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."

*Id.* at 419 (citing *Gore,* 517 US at 576-77). The Court acknowledged evidence in the record that indicated that State Farm had altered company records to make Campbell appear less culpable, had disregarded the "overwhelming likelihood of liability" and the "near-certain probability" of a judgment in excess of policy limits, and had first assured the Campbells that their assets would be safe from any verdict but then told them after a judgment had been entered in excess of policy limits that they would need to sell their house. *State Farm Mut. Ins.,* 538 US at 419-20. The Court concluded that, although State Farm's handling of the claims

"merits no praise," a "more modest punishment for this reprehensible conduct" would have satisfied the state's legitimate interest in deterring such conduct. *Id.* at 419-20.

In so holding, the Court began by declaring that the Utah case was not a proper vehicle for punishing State Farm's nationwide policies, because a state generally does not "have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction." *Id.* at 421. Moreover, the Court observed, the Utah courts had erroneously "awarded punitive damages to punish and deter conduct that bore no relation to the Campbells' harm." *Id.* at 422. In that respect, the Court noted that, although the Campbells had presented evidence of State Farm's nationwide practices in handling first-party claims, that evidence did not establish that State Farm was a "recidivist" in its treatment of third-party claims (like those arising from the underlying tort litigation) and, thus, the Campbells lacked evidence "of repeated misconduct of the sort that injured them." *Id.* at 423. Although acknowledging that State Farm's profit motives were the same regardless of whether it was underpaying first- or third-party claims, the Court concluded that punitive damages could not be awarded based on "any malfeasance" but, instead, must be based only on the type of malfeasance that harmed the plaintiffs. *Id.* at 423-24.

The Court then turned to the second guidepost, comparing the actual and potential damages to the punitive damage award. *Id.* at 424-25 (citing *TXO Production v. Alliance Resources*, 509 US 443, 458, 113 S Ct 2711, 125 L Ed 2d 366 (1993)). The Court noted that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process. *State Farm Mut. Ins.*, 538 US at 425. In particular, the Court cautioned that, although a 4:1 ratio between compensatory and punitive damages "might be close to the line of constitutional impropriety," a higher ratio may be proper "where a particularly egregious act has resulted in only a small amount of economic damages" (internal quotation marks omitted); conversely, when compensatory damages are substantial, the ratio may need to be lower. *Id.* The Court characterized the compensatory damages in *Campbell* as "$1 million for a year and a half of emotional distress,"

with minor economic harm and no physical harm or trauma involved and observed that emotional distress damages "likely were based on a component which was duplicated in the punitive award." *Id.* at 426.[23]

With respect to the third *Gore* guidepost, concerning the disparity between the punitive damages award and potential civil penalties, the Court simply noted that, under state law, the type of wrongdoing involved "appears to be a $10,000 fine for an act of fraud[.]" *Id.* at 428.

Ultimately, the Court concluded that the punitive damage award violated due process. In so holding, the Court noted that the facts, "especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award *at or near the amount of compensatory damages.*" *Id.* at 429 (emphasis added).[24]

■ Here, defendant maintains that, given *State Farm Mut. Ins.*'s refinement and amplification of the "guideposts," a punitive damage award in this case cannot constitutionally exceed $200,000. Defendant's position is rooted, initially, in several considerations pertaining to the alleged "reprehensibility" (or lack thereof) of defendant's conduct. First, defendant asserts that it caused only economic harm, rather than physical harm, and did not act in reckless disregard of the health or safety of others. Defendant further asserts that, although its conduct towards Munson could be regarded as evincing malice and deceit, plaintiff's evidence failed to demonstrate that—with one possible exception—defendant's other Oregon insureds suffered any injury (in the form of excess verdicts) as a result of the same sort of conduct.

---

[23] State Farm had ultimately paid the judgment in the underlying action, including the amount in excess of liability coverage limits. *Id.* at 414.

[24] On remand, the Utah Supreme Court concluded that the ratio of punitive to compensatory damages in that case should be 9:1. In doing so, the court emphasized the financial vulnerability of the insureds, the defendant insurer's failure to acknowledge the wrongfulness of its actions, its pride in the way it had mistreated its insureds, and that the damages were caused by intentional malice, trickery, and deceit. *Campbell v. State Farm Auto Ins. Co.*, 98 P3d 409, 416-17 (Utah), *cert den*, 543 US 874, 125 S Ct 114, 160 L Ed 2d 123 (2004).

Finally, defendant contends that Munson's "financial vulnerability" should be accorded no weight in the punitive damages calculus because, although Munson was essentially judgment-proof, that fact bore no causal relationship to defendant's "bad faith" conduct; that is, defendant did not engage in that conduct because of, or to take advantage of, Munson's financial status.[25]

In response, regarding reprehensibility, plaintiff emphasizes the duration of defendant's bad faith course of conduct, the self-interested malice that motivated that conduct, and the deceit that it evinced.[26] Plaintiff also points out that, given the "Voth doesn't pay policy limits" testimony, this was not merely an "isolated incident."

We conclude that the degree of reprehensibility is greater than defendant posits but less than plaintiff posits. Defendant is correct that this case, like *State Farm Mut. Ins.*, involves only economic, not physical, injury and that defendant's conduct did not implicate any "disregard of the health or safety of others[.]" 538 US at 419.

---

[25] Defendant contends:

" 'Financial vulnerability' could arise in a first-party insurance context, where an insurer intentionally offered to settle with its insured for a minimal amount, knowing that the insured party needed the money and would not hold out for more. In the instant case, Farmers' allegedly bad conduct exposed Mr. Munson to an excess verdict. But even assuming bad intent, what would be a malevolent insurer's interest in the ability of its insured to satisfy a judgment that exceeded policy limits?"

[26] Plaintiff repeatedly emphasizes, as evidence of "reprehensibility," defense counsel's conduct after obtaining information regarding the jury's deliberations in the wrongful death action, *i.e.*, that, rather than informing the court, counsel contacted the claims supervisor, Voth. *See* 202 Or App at 96. Plaintiff decries that conduct as "shocking" and "deplorable." But it does not follow that defendant's conduct, however improper, demonstrated bad faith *toward Munson*. If plaintiff essentially is suggesting that an insurer is obliged to act in "good faith" to settle on behalf of its insured when it improperly receives information concerning jury deliberations, that would be a great deal more "shocking" and "deplorable" than *failing* to act on the improperly obtained information.

Similarly, plaintiff points to defendant's efforts, in defending the bad faith action, to denigrate the decedent's character. Again, whatever the propriety of such a tactic—and however personally painful to plaintiff—we do not understand its relevance to an award of punitive damages on the *bad faith* claim. There is no suggestion in this record that defense counsel's pursuit of that tactic in this litigation somehow breached any obligation to *Munson*.

However, contrary to defendant's assertion, Munson's financial vulnerability is material to our assessment of reprehensibility—and, indeed, exacerbates defendant's punitive liability. At the time of the collision in 1987, Munson had virtually no assets—and the few that he did have were sold in the course of defending the criminal case. Munson then was faced with an excess liability verdict of over $750,000—an obligation, which, in all probability, he would never have been able to satisfy and which would have crippled him financially for years. We further note—and this pertains not only to financial vulnerability but also to whether defendant's tortious conduct was merely an "isolated incident"—that the same tortious conduct that injured Munson also had significant potential to cause the same harm to another of defendant's financially vulnerable insureds, Foley.[27] Although the jury in the wrongful death action ultimately did not find Foley liable, we are cognizant that defendant's failure to settle on Foley's behalf placed her, as well as Munson, at significant risk of an excess liability verdict, particularly in light of the fact that defendant had reason to know that Foley was being untruthful and might not be believed by a jury.

Finally, and perhaps most significantly with respect to reprehensibility, defendant's conduct here was manifestly malicious and deceitful. Defendant, over a course of years, engaged in a calculated course of conduct betraying its obligations to its insureds. Defendant deprecates this as "one out of five factors in a single guidepost among three guideposts." Defendant's arithmetic is much too simplistic: The egregious quality of defendant's conduct powerfully militates toward a substantial award of punitive damages.[28]

We next turn to the second prong of the *Gore* test, concerning "the disparity between the actual or potential

---

[27] Foley was an elderly widow. Although she was represented by counsel retained by defendant in the wrongful death action, she was unable to afford representation throughout most of the declaratory judgment action.

[28] We note, moreover, that this case, unlike *State Farm Mut. Ins.*, did not involve evidence of dissimilar wrongful conduct or conduct that was committed in other jurisdictions. Therefore, much of the discussion in *State Farm Mut. Ins.* concerning the relevance of certain types of evidence concerning reprehensibility simply is not pertinent to our analysis.

harm suffered by the plaintiff and the punitive damages award[.]" *State Farm Mut. Ins.*, 538 US at 418. Although the Court continues to admonish that this guidepost is not "marked by a simple mathematical formula," *id.* at 424 (citing *TXO*, 509 US at 458), it has decreed that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" and has cautioned that a 4:1 ratio "might be close to the line of constitutional impropriety." *State Farm Mut. Ins.*, 538 US at 425. In the present case, the ratio between the award of punitive damages to compensatory damages (as we have calculated them above) was more than 16:1.

Beyond *State Farm Mut. Ins.*'s admonition that a ratio exceeding single digits is constitutionally permissible only in extraordinary cases and *Gore*'s earlier caution that a ratio of 4:1 might approach constitutional limits, there is a certain circularity to the second *Gore/State Farm Mut. Ins.* guidepost. Presumably, the constitutionality of any award of punitive damages within the presumptive single-digit ratio range will depend on the application of the first (reprehensibility) and third (comparable civil penalties) guideposts. Beyond that, the only ratio-specific variable appears to be *State Farm Mut. Ins.*'s instruction that, in some cases involving relatively small amounts of compensatory damages, proportionately greater awards of punitive damages may be appropriate to effectuate the general purposes of punitive damages, with the obverse being true in some cases involving relatively large awards of compensatory damages. *State Farm Mut. Ins.*, 538 US at 426.

Ultimately, as a practical matter, the "ratio" guidepost serves as a sort of benchmark. Although fact-matching can be a fool's errand, cases involving roughly analogous circumstances, particularly with respect to the "reprehensibility" variables, should yield roughly similar ratios of compensatory and punitive damage awards. In that regard, it is instructive, although by no means conclusive, that, in *State Farm Mut. Ins.*, which also involved a bad faith refusal to settle a clear liability third-party auto death claim, the Supreme Court suggested that a 1:1 ratio on a $1,000,000 compensatory award would comport with due process. 538 US at 429.

Still, we hasten to emphasize that defendant's course of conduct in this case was considerably more protracted and, in our view, much more malicious than was the insurer's conduct in *State Farm Mut. Ins*.

Conversely, in three post-*State Farm Mut. Ins*. cases, all involving significant personal injury or death and a substantial threat to the health and safety of the consuming public, we have fixed constitutionally permissible punitive damages at a ratio of 4:1 or greater. In *Bocci v. Key Pharmaceuticals, Inc.*, 189 Or App 349, 360-61, 76 P3d 669, *modified on recons*, 190 Or App 407, 79 P3d 908 (2003), we ordered a remittitur of punitive damages from $22,500,000 to $3,500,000 on a compensatory award of $500,000—a ratio of 7:1. In so holding, we emphasized that the defendant pharmaceutical company had acted in "wanton disregard for the safety and health of others in knowingly and falsely promoting its product as safe[,]" that that conduct was repeated and continuing, and that that conduct had caused not only physical injury but also emotional distress and economic injury. 189 Or App at 358.

In *Waddill IV*, we ordered a remittitur of punitive damages from $1,000,000 to $403,416 on a compensatory award of $100,854—a ratio of 4:1. We emphasized that the defendant had produced and sold defective fishbowls (one of which had shattered causing serious and permanent injuries to the plaintiff in that case) without adequate warnings with "indifference to or reckless disregard for the health and safety of its customers." 190 Or App at 182. Thus, in *Waddill IV*—and unlike in *Bocci* or this case—there was no evidence of intentional wrongdoing, malice, or deceit. *Id.* at 182-83.

Finally, in *Williams v. Philip Morris Inc.*, 193 Or App 527, 92 P3d 126 (2004), *aff'd*, 340 Or 35, 127 P3d 1165 (2006), which concerned lung cancer caused by cigarettes, we reinstated a punitive damage award of $79,500,000 on a compensatory award of $821,485.80—a ratio of approximately 96:1. In so holding, we made two overarching observations: (1) "it is difficult to conceive of more reprehensible misconduct for a longer duration of time on the part of a supplier of consumer products to the Oregon public"; and (2) the ratio of compensatory and punitive damages could properly be

adjusted to account for "the potential magnitude of damage to [other members of] the public," which would "cause the ratio between compensatory and punitive damages, whatever it is, to fall within *State Farm*'s 4-to-1 boundary." 193 Or App at 562.

It is against that backdrop of *State Farm Mut. Ins.* and post-*State Farm Mut. Ins.* Oregon authority, with disparate ratios as reference points, that we must attempt in this case to chart a course of principled consistency.

We turn, finally, to the third guidepost, which involves comparison of punitive damages to civil penalties. Defendant maintains that it might be liable for only one $10,000 penalty for violation of the Oregon Insurance Code, ORS 731.988(1).[29] Without belaboring the point, we agree with plaintiff that the evidence here supports a determination that, at the very least, defendant through its course of conduct repeatedly violated that statute and that, because "[e]ach violation shall be deemed a separate offense," ORS 731.988(1), defendant faced potential liability for a plethora of penalties.[30]

We return to the application of the *Gore / State Farm Mut. Ins.* guideposts in this case. Any such application, albeit as "a matter of law," is necessarily imprecise—even, at least arguably, impressionistic. Nevertheless, given the guidance of *State Farm Mut. Ins.*, the distinctions of this case from *State Farm Mut. Ins.*, and the analysis of our post-*State Farm*

---

[29] ORS 731.988 provides, in part:

"(1) Any person who violates any provision of the Insurance Code, any lawful rule or final order of the Director of the Department of Consumer and Business Services or any judgment made by any court upon application of the director, shall forfeit and pay to the General Fund of the State Treasury a civil penalty in an amount determined by the director of not more than $10,000 for each offense. * * * Each violation shall be deemed a separate offense."

[30] Defendant points to several recent matters before the Oregon Insurance Division, each of which resulted in imposition of civil penalties, as being "comparable" to this case. We disagree with defendant's characterization of comparability. In none of those matters did the insurer continuously engage in conduct, violating its obligations to its insured, that exposed its insured to a virtually certain and devastating excess verdict. In none of those matters did the insurer manipulate the claims evaluation process and destroy documents in anticipation of a future bad faith claim.

*Mut. Ins.* decisions, we conclude that the maximum constitutionally permissible award of punitive damages in this case is three times the compensatory damage award.

Our reasoning is at least implicit from our foregoing discussion: Although the injury here was purely economic, without any threat to public health or safety, defendant's conduct was far more reprehensible—a calculated and repeated course of cynical and malicious betrayal of its insureds' trust—than the Court found to be the case in *State Farm Mut. Ins.* Nor was this an "isolated incident." Although certain features of defendant's conduct here may have been "isolated" or unique, there can be no question, viewing the evidence most favorably to plaintiff, that the "stonewalling," the "low-balling," the pressured manipulation of claims evaluations and the like, are all typical of how defendant did business: Defendant's interests came first. On balance, the egregiously unethical character of defendant's conduct justifies a proportionately greater award of punitive damages than the 1:1 ratio suggested by the Court in *State Farm Mut. Ins.* Conversely, the lack of serious physical injury or disregard for the health and safety of the consuming public dictates a proportionately lower award of punitive damages than in *Waddill IV*. Accordingly, a 3:1 ratio of punitive damages to compensatory damages in this case comports with due process.

On appeal, judgment vacated and remanded with instructions to grant defendant's motion for new trial, limited to punitive damages, unless plaintiff agrees to remittitur of punitive damages to three times compensatory damages award within 28 days of entry of appellate judgment. On cross-appeal, judgment vacated and remanded with instructions to recalculate compensatory damages in accordance with this opinion. Otherwise affirmed.